1  C. ANDREW WATERS, CA Bar No. 147259
   waters@waterskraus.com
2  MICHAEL L. ARMITAGE, CA Bar No. 152740
3  marmitage@waterskraus.com
   PAUL COOK, CA Bar No. 170901
4  pcook@waterskraus.com
   MICHAEL B. GURIEN, CA Bar No. 180538
5  mgurien@waterskraus.com
6
7  WATERS & KRAUS, LLP
   222 Sepulveda Boulevard, Suite 1900
8  El Segundo, California 90245
   Tel: (310) 414-8146
9  Fax: (310) 414-8156

   I hereby attest and certify on 12-4-06
   that the foregoing document is a full, true
   and correct copy of the original on file in
   my office, and in my legal custody.

10
11 Attorneys for Relator       CLERK U.S. DISTRICT COURT
                               CENTRAL DISTRICT OF CALIFORNIA

12                                    DEPUTY CLERK                1177

13          IN THE UNITED STATES DISTRICT COURT
14      FOR THE CENTRAL DISTRICT OF CALIFORNIA

15 UNITED STATES OF AMERICA        §
16 ex   rel.   MICHAEL   WILSON,   §    CV 06-06065
   Relator,                        §    Civil Action No. _____
17                                 §
18 STATE OF ARKANSAS ex rel.       §                        DDP(CTx)
   Michael Wilson, Relator,        §
19                                 §    JURY TRIAL DEMAND
20 STATE OF CALIFORNIA ex rel.     §
   Michael Wilson, Relator,        §
21                                 §    **FILED IN CAMERA**
22 STATE OF DELAWARE ex rel.       §    **AND UNDER SEAL**
   Michael Wilson, Relator,        §    **PURSUANT TO**
23                                 §    **31 U.S.C. § 3730**
24 DISTRICT OF COLUMBIA ex rel.    §
   Michael Wilson, Relator,        §
25                                 §
26 STATE   OF   FLORIDA   ex rel.  §    DOCKETED ON CM
   Michael Wilson, Relator,        §
27                                 §    SEP 28 2006
28 STATE OF HAWAII ex rel. Michael §
   Wilson, Relator,                §    BY _____ 019

ORIGINAL

- 1 -

| | |
|---|---|
| 1 | |
| 2 | STATE OF ILLINOIS ex rel. Michael Wilson, Relator, |
| 3 | |
| 4 | STATE OF LOUISIANA ex rel. Michael Wilson, Relator, |
| 5 | |
| 6 | STATE OF MASSACHUSETTS ex rel. Michael Wilson, Relator, |
| 7 | |
| 8 | STATE OF NEW MEXICO ex rel. Michael Wilson, Relator, |
| 9 | |
| 10 | STATE OF NEVADA ex rel. Michael Wilson, Relator, |
| 11 | |
| 12 | STATE OF TENNESSEE ex rel. Michael Wilson, Relator, |
| 13 | |
| 14 | STATE OF TEXAS ex rel. Michael Wilson, Relator, |
| 15 | |
| 16 | STATE OF VIRGINIA ex rel. Michael Wilson, Relator, |
| 17 | |
| 18 | vs. |
| 19 | |
| 20 | BRISTOL MYERS SQUIBB, INC.; |
| 21 | AND JOHN DOES 1-10, |
| 22 | Defendants. |

## COMPLAINT FOR DAMAGES UNDER THE FEDERAL FALSE CLAIMS ACT AND VARIOUS STATE FALSE CLAIMS ACTS AND DEMAND FOR JURY TRIAL

### I.     INTRODUCTION

1.     Relator Michael Wilson brings this action on behalf of the United States

- 2 -

pursuant to the False Claims Act, 31 U.S.C. § 3729 et seq., and on behalf of various states pursuant to state statutes to recover penalties and damages arising from fraudulent and illegal practices of Bristol Myers Squibb, Inc. ("BMS").

2.     BMS, in marketing several drugs (among them Plavix, Pravachol, Glucovance, Glucophage, Monopril, and Avapro), engaged in a course of illegal and fraudulent conduct aimed at doctors and health care providers whose patient-bases were comprised mainly of those enrolled with Medicaid. Specifically, BMS encouraged these doctors and health care providers to prescribe BMS pharmaceuticals for off-label uses. To this end, BMS deliberately misinformed physicians about the indications for these drugs. Additionally, in order to increase its market share, BMS unlawfully provided these high-prescribing doctors with lavish gifts, expensive meals, sham honoraria, trips, hotel stays, and large quantities of samples, both in order to induce them to prescribe BMS' drugs and in order to reward them for doing so. BMS sought to conceal this kickback scheme by various means, including by employing a public relations firm and manipulating "faxbacks." When Relator Wilson complained of these practices to BMS and outside authorities, BMS retaliated against him and then eventually fired him.

II.     PARTIES

3.     Relator Michael Wilson is a citizen of the United States and a resident of the State of California. He was employed by BMS as a sales representative for more than eight years, and as such, developed firsthand knowledge of the facts set forth herein. Michael Wilson is thus the original source of the facts and information set forth in this

Complaint concerning the activities of BMS. The facts averred herein are based entirely upon his personal observation and documents in his possession.

4. Relator has provided to the United States Attorney and the Attorneys General of Arkansas, California, Delaware, Florida, Hawaii, Illinois, Louisiana, Massachusetts, New Mexico, Nevada, Tennessee, Texas, Virginia and the District of Columbia a full disclosure of substantially all material facts, as required by the False Claims Act, 31 U.S.C. § 3730(b)(2), and relevant state statutes.

5. Defendant Bristol-Myers Squibb is incorporated in the State of Delaware, with its corporate headquarters in New York, New York. BMS is principally engaged in the manufacture and sale of pharmaceuticals including prescription pharmaceuticals falling under the jurisdiction and regulation of the U.S. Food and Drug Administration.

### III. JURISDICTION AND VENUE

6. This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This court also has jurisdiction pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331. Supplemental jurisdiction for Counts VII - XXII arises under 28 U.S.C. § 1367, since these claims are so related to the federal claims that they form part of the same case or controversy under Article III of the U.S. Constitution.

7. At all times material to this Complaint BMS regularly conducted substantial business within the State of California, maintained permanent employees and offices in California, and made and is making significant sales within California. BMS is thus subject to personal jurisdiction in California.

8.      Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because BMS transacts business in this district.

## IV.    FACTS

**BMS Pursued a Scheme to Encourage Off-Label Prescriptions of Plavix and Pravachol Among Physicians Treating Medicaid Patients**

9.      The Federal Food, Drug and Cosmetic Act ("FDCA"), among other things, governs the lawful interstate distribution of drugs for human use.  As codified at Title 21, United States Code, sections 331 *et seq.*, and specifically at § 355(b), the FDCA and its implementing regulations require that before a new drug may legally be distributed in interstate commerce, a sponsor of a new drug product must submit a New Drug Application ("NDA").

10.     The FDCA requires, at 21 U.S.C. § 355, that the NDA sponsor submit to the United States Food and Drug Administration ("FDA") as part of an NDA, proposed labeling for the proposed intended uses for the drug that include, among other things, the conditions for therapeutic use.  The NDA must also provide, to the satisfaction of the FDA, data generated in randomized and well-controlled clinical trials that demonstrates that the drug will be safe and effective when used in accordance with the proposed labeling.

11.     The FDCA, 21 U.S.C. § 355, prohibits the introduction into interstate commerce of any new drug, unless an approval of an NDA is effective.  Only after the NDA, including the proposed labeling, is reviewed and approved by the FDA is the

sponsor permitted by law to promote and market the drug, and only for the medical conditions of use specified in the approved labeling, for which use the FDA has found sufficient evidence of safety and effectiveness.  Uses not approved by the FDA and not included in the drug's approved labeling are called "unapproved uses" or "off-label" uses.

12.    The FDCA and the regulations promulgated thereunder require that, in order to label or promote a drug for a use different from the conditions for use specified in the approved labeling, the sponsor has to file a new NDA or amend the existing NDA by, among other requirements, submitting the newly proposed indications for use and evidence, in the form of randomized and well-controlled clinical studies, sufficient to demonstrate that the drug would be safe and effective for the newly proposed therapeutic use or uses. 21 U.S.C. § 360aaa, *et seq.*  Only upon approval of the new NDA can the sponsor promote the drug for the new intended use.

13.    BMS submitted an NDA # 20-357 for approval of a drug called Glucophage (metformin hydrochloride), which was a new drug within the meaning of 21 U.S.C. § 321(p) and 21 C.F.R. 310.3(h)(4) and (5).  On or about December 29, 1994, the FDA approved Glucophage to treat non-insulin dependent patients with diabetes mellitus.

14.    BMS submitted an NDA # 02-839 for approval of a drug called Plavix (clopidogrel bisulfate), which was a new drug within the meaning of 21 U.S.C. § 321(p) and 21 C.F.R. 310.3(h)(4) and (5).  On or about November 17, 1997, the FDA approved Plavix for use in reducing the risk of ischemic stroke, myocardial infarction, or vascular death in patients with documented atherosclerosis. On or about February 2002, the FDA

further approved Plavix for use in reducing the acute and long-term risk of future heart attack, stroke, or cardiovascular death in patients with acute coronary syndrome (ACS).

15.    On or about April 13, 1999, BMS submitted an NDA # 19-898 for approval of a drug called Pravachol (pravastatin sodium), which was a new drug within the meaning of 21 U.S.C. § 321(p) and 21 C.F.R. 310.3(h)(4) and (5).  On or about February 10, 2000, the FDA approved Pravachol for the "prevention of coronary events . . . in hypercholesterolemic patients without clinically evident coronary heart disease."

16.    BMS submitted an NDA # 19-915 for approval of a drug called Monopril (fosinopril sodium), which was a new drug within the meaning of 21 U.S.C. § 321(p) and 21 C.F.R. 310.3(h)(4) and (5).  In or about 1991, the FDA approved Monopril to treat hypertension and as an adjunct in treating heart failure.

17.    As set forth in more detail below, neither Glucophage, Plavix, Pravachol or Monopril was approved for any use or condition other than the approved uses described above.   Nevertheless, BMS actively encouraged doctors to prescribe Glucophage, Plavix, Pravachol and Monopril for uses that were not approved and were therefore "off-label." BMS did not file a new NDA seeking FDA approval for any of these unapproved uses during the time period addressed in this Complaint.[1]

18.    Specifically, Glucophage was not approved for use to induce ovulation.

19.    Plavix was not approved for use in diabetics; for treatment of numbing and tingling associated with Peripheral Arterial Disorder (PAD); to replace the drug

---

[1] On or about August 20, 2006, the FDA approved a supplemental NDA for Plavix to reduce the rate of death from any cause and the rate of a combined endpoint of re-infarction, stroke or death in patients with acute ST-segment elevation
Continued on the next page

-7-

Pletal—manufactured by Otsuka America Pharmaceutical, Inc.—in treating numbing, tingling, and claudication associated with PAD; or to prevent future cardiac problems in association with aspirin. Claims made by BMS in this regard were false.

20.    Further, Pravachol was not approved for use in patients with diabetes, for prevention of stroke in patients who did not have clinically evident coronary disease, for use in patients with borderline high LDL-C cholesterol levels, or for use in transplant patients. Claims made by BMS in this regard were also false.

21.    Upon information and belief, Monopril was not approved for use in patients with kidney-disease.    Nevertheless, BMS marketed Monopril for this use.    Upon information and belief, this use was not approved and was therefore off-label. Moreover, representations that BMS made in marketing Monopril for patients with kidney disease were false.

22.    BMS focused its efforts to promote such off-label prescriptions among doctors whose patient population was composed mainly of Medicaid subscribers.

23.    Whether a drug is FDA-approved for a particular use will largely determine whether a prescription for that use of the drug will be reimbursed under the federal and state Medicaid programs.    Reimbursement under Medicaid is, in most circumstances, available only for "covered outpatient drugs." 42 U.S.C. § 1396b(i)(10).    Covered outpatient drugs do not include drugs that are "used for a medical indication which is not a medically accepted indication." Id. § 1396r-8(k)(3).    A medically accepted

---

Continued from the previous page
myocardial infarction (STEMI).

indication, in turn, includes a use "which is approved under the Federal Food Drug and Cosmetic Act" or which is included in specified drug compendia. Id. § 1396r-8(k)(6). See also id. § 1396r-8(g)(1)(B)(i). Thus, unless a particular off-label use for a drug is included in one of the identified drug compendia, a prescription for the off-label use of that drug is not eligible for reimbursement under Medicaid. Likewise, many state Medicaid agencies intend not to reimburse for prescription drugs not set forth in the drug compendia because they do not wish to spend money on prescriptions not recognized as medically necessary in sources specified by federal law. Neither Glucophage, Plavix nor Pravachol was eligible for reimbursement from federal or state Medicaid programs when prescribed for off-label use because none of these drugs' off-label uses were included in one of the compendia specified by 42 U.S.C. § 1396r-8(g)(1)(B)(i).

24. For example, one of these drug compendia, American Hospital Formulary Service (AHFS) Drug Information (2002), lists the following as "uses" of pravastatin sodium (Pravachol):

- Use "as an adjunct to dietary therapy in patients with hypercholesterolemia without clinical evidence of CHD [coronary heart disease] to reduce the risk of myocardial infarction . . . ."

- Use "as an adjunct to dietary therapy in patients with clinical evidence of CHD to reduce the risk of total mortality . . . ."

- Use as "an adjunct to dietary therapy in patients with clinical evidence of CHD to slow the progression of atherosclerosis."

- Use "as an adjunct to dietary therapy to decrease elevated serum total and LDL-cholesterol . . . in the treatment of primary hypercholesterolemia and mixed dyslipidemia . . . ."

- Use "as an adjunct to dietary therapy to decrease elevated serum total and LDL-cholesterol . . . and to increase HDL-cholesterol concentrations in the treatment of primary hypercholesterolemia and mixed dyslipidemia."

- Use "as an adjunct to dietary therapy for the treatment of patients with primary dysbetalipoproteinemia who do not respond adequately to diet."

- Use as "an adjunct to dietary therapy in the treatment of patients with elevated serum triglyceride concentrations."

25.     The compendium also mentions studies of Pravachol use in "a few patients without clinical evidence of CHD who had mild to moderate elevations of LDL-cholesterol," including in diabetics, and patients with cardiac or liver transplantation. However, it does not consider these studies in the section on primary uses of Pravachol. The 2000 AHFS Drug Information does not mention these studies at all.  These uses therefore were not eligible for reimbursement under state Medicaid plans.

26.     Likewise, the AHFS Drug Information compendium states that clopidogrel bisulfate (Plavix) "is used to reduce the risk of cardiovascular events . . . in patients with atherosclerosis documented by recent ischemic stroke, recent myocardial infarction . . ., or established peripheral arterial disease."  The compendium does not mention use of Plavix to treat numbing and tingling associated with PAD, and does not indicate the clopidogrel is indicated for use to treat intermittent claudication, the limping and

- 10 -

cramping of the calves for which the drug Pletal is approved.

27.     Moreover, although the compendium does mention that clopidogrel "has been used concomitantly with aspirin," it states that "the incidence of major bleeding was substantially increased in patients receiving clopidogrel and aspirin compared with that in patients receiving aspirin and placebo." Under "drug interactions," the compendium states that the safety of clopidogrel use with aspirin is "not established," explaining that "clopidogrel may potentiate aspirin's antithrombotic effects, increased risk of bleeding." Thus, BMS' promotion of Plavix as a replacement for Pletal and for use with aspirin is not properly contemplated by the compendia, and was fraudulent.

28.     As such, BMS' conduct caused physicians to submit numerous prescriptions for Glucophage, Plavix, Pravachol and Monopril that were ineligible for reimbursement under Medicaid because they were prescribed for an off-label use. BMS thus caused the submission of false claims for payment of money under the federal Medicaid program, Medi-Cal (California's Medicaid program), and other state Medicaid programs.

### A. BMS Sponsored and Promoted Off-Label Research

29.     In order to promote a fraudulent scheme of encouraging off-label prescriptions, BMS sponsored and paid for research to promote off-label uses of Glucophage, Pravachol and Plavix. For example, Michael Wilson was encouraged to present to physicians a reprint of an article claiming that Pravachol co-administered with gemfibrozil can help in some cases of "hyperlipidemia." The study upon which

the article was based was supported by BMS. A 2001 sales visual aid promotes the BMS funded CARE trial, which claimed that typical diabetic patients with average LDL-C levels would benefit from further improvement in lipid levels with Pravachol treatment. BMS also provided to Mr. Wilson a January 23, 2001 journal reprint of an article in *Circulation*, which claims that Pravachol usage protects patients from becoming diabetic.

30. BMS also paid for published research claiming that Pravachol was effective for use on diabetic patients and patients with borderline high LDL-C. BMS also promoted research claiming that Pravachol was more effective than other statins for transplant patients.

31. BMS paid for research that promoted Plavix as a replacement for the competing drug Pletal to treat numbing and tingling associated with PAD. BMS also paid for research that claimed that Plavix plus aspirin were more effective against future cardiac events. Additionally, BMS promoted research asserting that Glucophage was effective for stimulating ovulation.

32. BMS promoted this research in teleconferences for physicians. It also paid influential physicians to speak to other doctors about these studies. BMS clearly saw the off-label promotion of these drugs as beneficial to the company: in a "Situational Analysis" provided to its sales representatives, BMS noted that Plavix "Combo with ASA [aspirin]" provided the company a sales opportunity.

BMS Trained Its Sales Representatives to Promote Off-Label Prescriptions

33. BMS also directed its sales representatives to promote off-label uses among

- 12 -

physicians and pharmacists.  In a 2003 "sales presentation" message for its drug representatives catering to physicians whose patients were enrolled in what BMS called the "Fortune Five" (the top five insurance carriers, including Medi-Cal), BMS told its sales representatives that Pravachol is for patients with diabetes and borderline high cholesterol.  In October 2003, BMS' Los Angeles sales "pods"[2] were encouraged to set up lunches with several pharmacists.  BMS' sales representatives were told to "confirm and reinforce" to these pharmacists physicians' preference for the use of Pravachol in transplant patients.  In the same month, BMS sponsored at least two lunches on Pravachol safety at which a presentation was made on BMS-sponsored studies of Pravachol use in diabetic patients.

34.    BMS also encouraged its sales representatives to target specific doctors for off-label prescriptions.  For example, an undated document coached Mr. Wilson and his pod to encourage cardiologists who were prescribing Lipitor to attend a BMS medical education program and to prescribe Pravachol for their diabetic patients.  Mr. Wilson and members of his pod are also coached to encourage a doctor to prescribe Pravachol for his "borderline-high patients."

35.    BMS also told its sales representatives to target physicians with high Medicaid/Medi-Cal patient populations.  Mr. Wilson's pre-sales call planning sheets indicate that these high Medicaid/Medi-Cal prescribers were told, on BMS' instructions, that Pravachol should be used with diabetic patients on multiple medications, and that

---

[2] During the time of Mr. Wilson's employment with BMS, its basic sales organization was a "pod." Pods consisted of groups of pharmaceutical representatives touting the values of the same drugs in the same geographical territory.  Mr.
Continued on the next page

- 13 -

Plavix should be used in patients with numbing and tingling or diabetes. None of these indications was approved by the FDA.

36.   A "Pre-Call Targeting" sheet identifies a doctor as a 91 percent Medi-Cal physician and a 91 percent Plavix prescriber. The sheet directs sales representatives to tell this doctor about Plavix use in patients with PAD and diabetes.

37.   A coaching sheet for BMS sales representatives gave them the following script for encouraging physicians to prescribe Pravachol for off-label uses: "for patients with borderline-high LDL, Pravachol 40 mg can get many to goal with LDL-C reductions of about 34 percent." This script prescribed an unapproved and off-label usage of Pravachol.

38.   BMS sales representatives were also given a sales training on catheter stents that stated: "Plavix is not indicated for use in patients undergoing coronary stent procedures." BMS nevertheless encouraged its sales representatives to have physicians sign "faxbacks"—purported "requests" from physicians on drug information— regarding pre- and post-stent use of Plavix. Moreover, during this training sales representatives were told: "You should stress Plavix long-term therapy for post-myocardial infarction patients who may also have a stent."

39.   BMS sales representatives were also given sales training on promoting Plavix use among patients with PAD, an unapproved and off-label use of Plavix. BMS' training suggested that over half of all PAD suffers are asymptomatic, creating the

Continued from the previous page
Wilson's pod covered the downtown territory of Los Angeles.

- 14 -

notion that millions of people suffer from PAD without observable symptoms, and that Plavix should be used for patients regardless of symptoms.

40.     BMS trained its sales representatives in methods to encourage inquiries from physicians about off-label uses.  For example, in order to provoke questions about off-label uses of Pravachol to treat diabetics and patients with borderline high LDL questions, BMS instructed its sales representatives in a September 10, 2003 sales memo to probe doctors with the question, "Looking at Lipitor and Pravachol, which would you pick for the patient with an LDL of 160 or less? Why?"

### B.  BMS Promoted Off-Label Prescribing in Continuing Medical Education Programs

41.     BMS provided continuing medical education to physicians that emphasized off-label uses of Glucophage, Plavix, Pravachol and Monopril.  A 2001 continuing medical education CD prepared by Cogenix LLC, a professional services firm to which BMS outsourced many of its continuing medical education programs, informs physicians of an American Heart Association Annual Scientific Session on the effect of cholesterol lowering drugs on diabetes.  The study discussed was supported by an unrestricted educational grant from BMS.

42.     At a continuing medical education conference held by BMS on or about November 10, 2001, BMS presented a program on the use of statins such as Pravachol in patients with insulin-resistance syndrome, an unapproved and off-label use.

43.     On or about June 29-30, 2002, BMS invited high-prescribing physicians to

attend a two-day program at a resort in La Jolla, California, where they presented seminars on the use of Pravachol in diabetic populations.

44.   In a memo for an August 1, 2002 series of programs called "Plavix Cardiology Network Program," BMS provided instructions to its sales personnel for securing a speaker for an autumn cardiology continuing medical education program. BMS instructed its district business managers to get approval of the speaker from Plavix marketing, a BMS office. Speakers were required to attend BMS Cardiology Network program training. Invitations to the event were limited to those physicians that are on the BMS START target reports for high volume prescribers, plus up to 20% "non-targets" that the speaker could add to the list.  BMS directed that it would send slides and "backup content" to the speaker before the training conference.

45.   BMS' 2003 California Fortune Five Plan instructed sales representatives to set up dinners to promote off-label prescriptions of Pravachol.  The purpose of the dinners was to target doctors enrolled with certain insurers.  To this end, the plan directs sales representatives to spend $5,000 for two Medi-Cal "Med Ed dinners."

46.   On or about May 22, 2003, BMS funded a continuing medical education event held by Phoenix Marketing Solutions on the use of cholesterol lowering drugs in Acute Coronary Syndrome, not an approved indication for Pravachol.

47.   On or about February 26, 2004, BMS sponsored a dinner meeting for physicians at Le Meridien Hotel on the use of Plavix for management of Peripheral Arterial Disease.  Also slated for discussion was the off-label use of Pravachol in patients with average cholesterol levels.  From BMS' perspective, the purpose of the

meeting was to "maintain and grow Pravachol marketshare in Medi-Cal accounts."

48.    On March 18, 2004, Michael Wilson was directed by his BMS district business manager, Kim Johnson, to set up a dinner for pharmacists to promote Plavix as an off-label replacement for the competing drug Pletal in the treatment of numbing and tingling experienced by patients with PAD.   On Ms. Johnson's instructions, Mr. Wilson set up the dinner on June 8, 2004 at Katana, a lavish Los Angeles restaurant.   In addition, another lavish dinner event at Katana restaurant for physicians discussing Plavix's off-label use for PAD numbing and tingling was scheduled for June 16, 2004, with the guest speaker scheduled to receive an honorarium of $2500.   This dinner was eventually cancelled, but the guest speaker was still paid his $2500 honorarium.

49.    In order to conceal its involvement in these continuing medical education programs, BMS hired third-party contractors such as Cogenix LLC, Clinical Insights, Inc., and BLP Group Companies, to arrange and organize dinner events and seminars. Nevertheless, it was the BMS marketing department that chose the speakers and target audience members for these events.   The BMS marketing department based these decisions on physicians' BMS-product prescription volume or their influence in their respective medical communities.   BMS also chose speakers and target audience members based on the volume of Medicaid prescriptions they wrote.   The speakers at these events promoted off-label indications of Pravachol and Plavix, and were often given slides prepared by BMS to use at the events.

**C.   *BMS Continued to Promote Off-Label Uses Despite FDA Warnings***

- 17 -

50.    On August 7, 2003, the United States Food and Drug Administration sent BMS an official warning letter, requiring BMS to cease deceptive marketing. Specifically, the FDA was concerned with, among other things, representations in BMS' promotional materials that Pravachol was approved for use in patients with diabetics.  The FDA noted that BMS had made claims implying "that Pravachol has been shown to be effective to reduce cholesterol and the risk of cardiovascular outcomes specifically in patients with diabetes."   The FDA stated that "[t]his implication is false.  FDA is not aware of substantial evidence or substantial clinical experience, let alone 'landmark clinical studies' measuring cardiovascular outcomes with the use of Pravachol in a diabetes patient population that support the above claims."  The FDA ordered the immediate cessation of dissemination of promotional materials making such claims.

51.    Despite this clear instruction, Mr. Wilson and other representatives received orders from their superiors at BMS to continue to market Pravachol as though it was especially beneficial for diabetic patients.   For example, in a September 10, 2003 Pravachol sales memo, sales representatives were directed to probe doctors with the question, "Looking at Lipitor and Pravachol, which would you pick for the patient with an LDL of 160 or less? Why?"  Moreover, as set forth above, shortly after receiving the FDA letter, in October 2003, BMS sponsored at least two lunches on Pravachol safety at which a presentation was made on BMS-sponsored studies of Pravachol use in diabetic patients.  A January 2004 Downtown Los Angeles Territory Key Business Issues Document, which was generated by BMS management, directs sales

representatives that "[f]or patients with Average Cholesterol Levels, use CARE to show Pravachol's efficacy." BMS continued unlawfully to market Pravachol as beneficial for diabetic patients and those with borderline high LDL levels until at least March or April of 2004.

### D. BMS' Claims About the Safety and Efficacy of Certain Off-Label Uses Was False

52.    Many of the claims BMS made about the safety and efficacy of off-label uses of Glucophage, Pravachol, Plavix and Monopril were false. First, as set forth above, there was no substantial evidence or clinical experience to support BMS' claims that Pravachol was safe or effective for use in patients with diabetes.

53.    Moreover, BMS management directed its sales representatives to claim that Pravachol was not metabolized by the CYP450 enzymes in the body, and therefore did not have the risk of muscle damage that other statin drugs caused. However, this was untrue: Pravachol merely had a reduced use of CYP450 enzymes for metabolization, and therefore merely a reduced risk of muscle tissue damage. This false information was imparted when sales representatives promoted Pravachol off-label for diabetics, for borderline LDL-C patients, and for transplant patients.

54.    Further, BMS instructed its sales representatives to represent to physicians that the prescription of Plavix with aspirin was safe, although it could cause excessive bleeding in certain patients. BMS instructed its sales representatives to blame the aspirin on the bleeding, even though BMS knew that it was the Plavix that caused this

complication.

55.     By falsely presenting Glucophage, Plavix, Pravachol, and Monopril as having properties that they did not, BMS caused physicians to write prescriptions that impliedly certified that the drug was medically necessary and appropriate. These certifications were false. Nonetheless, Medicaid relied upon them in paying for Glucophage, Pravachol and Plavix in patients that did not have conditions for which Glucophage, Pravachol and Plavix were approved to treat. Had the Government known that these prescriptions were for unapproved, off-label uses, it would not have paid them pursuant to Medicaid. Thus, BMS' actions caused the United States and the various states to suffer monetary damages.

### *E. BMS Sought to Hide Its Scheme to Promote Off-Label Uses of Its Drugs*

56.     BMS sought to hide its scheme promoting off-label use among physicians by the fraudulent use of "faxbacks." Under the relevant regulations, a pharmaceutical company may distribute publications created by "third parties" that described the results of off-label uses of BMS drugs, if such if such material is distributed in response to non-solicited requests from physicians. BMS decided to exploit this narrow exception by using faxbacks and third parties to set up events that promoted off-label uses of BMS products.

57.     BMS instructed and trained its sales representatives to initiate conversations with physicians about off-label uses. Once a physician showed interest, the sales representative would instruct the physician to sign a "request" for information on the

particular off-label use, which would be faxed to BMS. Once the original form had been faced to BMS' department responsible for direct communication with physicians, and the requested information had been faxed back to the physician, BMS sales representatives would keep the original faxback, whiting out the date of the request and the nature of the information requested. BMS instructed its sales representatives to use the same, signed form to fax in a new "request" whenever they wanted to send that doctor some off-label information. In other words, BMS sales representatives fraudulently altered faxback requests to make the promotion of off-label prescriptions look legitimate. This practice was not only condoned, but was actively promoted by BMS sales managers. At one regional meeting, a BMS sales manager openly urged sales representatives to "just do what I do—change the date!"

58. BMS sales representatives were graded on the numbers of faxbacks they obtained from physicians per week, and their bonuses and incentive compensation was tied to the number of faxbacks sent to physicians. Further, BMS sales representatives were given weekly quotas by their district business managers on the number of faxback requests they needed to elicit from physicians.

59. BMS also sought to conceal its fraudulent conduct by hiring third parties such as Cogenix, Advanced Health Media, BLP Group Companies, and Clinical Insights, Inc. to organize continuing medical education events at which off-label uses of BMS products would be promoted. The FDA's off-label marketing restrictions permit physicians to learn about off-label uses of pharmaceuticals at seminars. Such seminars, however, must be truly independent of the drug companies. The drug companies may

make "unrestricted grants" for the purpose of a seminar, but may not be involved in formulating the content of the presentations, picking the speakers, or selecting the attendees. None of these requirements were observed with regard to the continuing medical education seminars sponsored by BMS for the promotion of BMS drugs. All aspects of these events were controlled by BMS. For example, BMS itself prepared slides for "independent" speakers. All costs were paid by BMS, and payments funneled through the third party contractors.

60.     On one occasion, sales representatives were directed to invite physicians to a continuing medical education lecture on Pravachol for diabetic patients that took place on November 10, 2001. The event was conducted by Clinical Insights, Inc., a third party continuing medical education company, but BMS paid for the activity with an "unrestricted educational grant."

### F. BMS Used Active Concealment to Avoid the Formulary Policies of Various State Medicaid Programs

61.     Generally, a state Medicaid program will not reimburse a prescription for a pharmaceutical that is not included on the state formulary. In California and other states, however, a physician can request that Medicaid (Medi-Cal in California) cover a certain drug for a particular patient by submitting a treatment authorization request ("TAR"). In order to have its non-formulary drugs, including Plavix, regularly prescribed to Medicaid patients, BMS directed its sales representatives to assist physicians' offices in filling out Medicaid TARs and prior authorization forms. On BMS' instruction, sales representatives would train physician staff members on filling

out TARs and would actually assist in filling them out for specific patients.

62.    BMS directed sales representatives also to instruct pharmacists in filling out TAR and prior authorization forms.

63.    BMS encouraged its sales representatives to instruct physicians, their staff, and pharmacists to fill out these forms in such a way as to conceal or exaggerate a patient's actual symptoms or side effects in order to ensure payment through the Medicaid system.    BMS also created sales brochures that were designed to instruct physicians and pharmacists on how to fill out prior authorization forms in a way that concealed or exaggerated the patient's actual symptoms or side effects to ensure payment through Medicaid and other insurance systems.    By training and instructing physicians and pharmacists on fraudulent ways in which to have TARs approved that otherwise would not be accepted by Medicaid, BMS caused the fraudulent submission of claims to Medicaid, Medi-Cal, and other state Medicaid programs.

64.    For example, BMS sent a memo to its California sales staff on November 3, 2003 about a change in Medi-Cal policy requiring that patients be switched off of Pravachol to the cheaper generic lovastatin drug, unless the physician fills out a prior authorization form requesting Pravachol. The Medi-Cal prior authorization form required that the physician justify the treatment with the more expensive Pravachol by writing one of four reasons that the patient could not tolerate or had an adverse response to lovastatin. Management directed sales representatives to present this information to Medi-Cal physicians and to coach them to manipulate information and make misrepresentations on the prior authorization forms in order to continue to get patients

put on Pravachol. The sales representatives were then to go to the pharmacy that the physician normally used and ensure that the pharmacy understood that it would be receiving these prior authorization forms, and that the pharmacy was to request Pravachol from Medi-Cal for these patients.

65. BMS also created a sales memo entitled, "Medi-Cal and Plavix: Making TARs Less Sticky," which instructs sales representatives to target high and very high prescribing doctors offices with Medi-Cal patients, and determine how many Plavix prescriptions "slip through the cracks"—meaning the TARs do not get fully processed, and prescriptions get filled for a generic or other drug instead. The memo further instructed sales representatives to find the pharmacists who fill prescriptions for the doctor and invite them to teleconference lunches to get their assistance in ensuring that Plavix would get filled on those prescriptions.

66. Moreover, as set forth in more detail below, BMS encouraged its sales representatives to offer physicians and pharmacists lavish dinners, cash payments, and gifts to persuade physicians to assent in allowing BMS sales representatives to assist with the TARs. For example, as already discussed above, On March 18, 2004, Michael Wilson was directed by his BMS district business manager, Kim Johnson, to set up a dinner for pharmacists to promote Plavix as an off-label replacement for the competing drug Pletal in the treatment of numbing and tingling experienced by patients with PAD. Ms. Johnson directed Mr. Wilson to make part of the dinner focus on getting the pharmacists to push TARs through Medi-Cal. On Ms. Johnson's instructions, Mr. Wilson set up the dinner on June 8, 2004 at Katana, a lavish Los Angeles restaurant.

67.     BMS' goal in encouraging the widespread use of TARs and prior authorization requests was two-fold.  First, BMS sought to make claims on Medicaid that otherwise would not be eligible for reimbursement.  Second, the number of TARs received by state Medicaid programs directly influences whether a pharmaceutical is placed on a state's formulary.  Thus, by encouraging physicians to submit false TARs, BMS sought unlawfully and fraudulently to influence Medicaid state programs to place BMS drugs, such as Pravachol and Plavix, on state formularies.

**BMS Used Kickbacks in Order to Encourage Medicaid-Prescribing Doctors to Prescribe BMS Drugs and Write Off-Label Prescriptions**

68.     Federal laws and regulations governing Medicaid and similar state statutes prohibit entities such as BMS from providing kickbacks to physicians and medical care providers.  Specifically, the Medicaid Anti-Kickback provision, 42 U.S.C. § 1320a-7b(b) (2)(B), provides:

> [W]hoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

69.     "Kickbacks" have been defined as including payments, gratuities, and other benefits paid to physicians who prescribe prescription drugs by the manufacturers of the drugs.

70.     In order to encourage physicians to prescribe BMS' pharmaceuticals for both approved uses and for unapproved, off-label uses, BMS established a system in which kickbacks were regularly provided to physicians who were prescribers of large amounts of BMS drugs, particularly Plavix, Pravachol, Glucovance, Glucophage, Monopril, Avapro, Tequin, and Avandia.

71.     BMS established formal internal guidelines for the award of these benefits to physicians, which were based entirely on the amount of prescriptions written by the physicians and the ability of the physician to influence other physicians to begin prescribing BMS drugs. For example, a BMS Sales Action letter dated August 15, 2003 states, "We need to ensure that VH [very high prescription volume] and H [high prescription volume] MDs are called on with more frequency. You will be in the same group of zip codes every other week, seeing VH and H MDs but not necessarily M [medium volume prescribers], L [low volume], and VL [very low] with same frequency." The same document states, "Our call and sample activity shows we are spending too much time and Resources [resources are DME and budget items] with M, L, and VL MDs. This must stop ASAP as it does not provide ROI, profit or maximum IC [incentive compensation , or sales staff bonuses]."

72.     BMS also produced a sales plan called "Rounding up the Docs!" This plan instructs BMS sales representatives at dinner events to "Gain commitment to prescribe

in specific patient types!" It goes on to direct them to "Monitor Weekly NRx [number of new prescriptions, by doctor] reports and Weekly Prescriber Reports to evaluate the success of the program," and then "Hold customers accountable."

73.     BMS particularly targeted high prescribing physicians who had large populations of patients that received Medicaid. For example, an attendance roster at a Clinical Advisory Council meeting for downtown Los Angeles, which was held on or about November 8, 2001, shows that five out of the 10 physicians that attended the event were listed as high Medicaid/Medi-Cal prescribers who had been targeted in BMS sales plans. Five out of 10 attendees at a March 20, 2002 Clinical Advisory Council meeting were listed as high Medicaid/Medi-Cal prescribers by BMS. Finally, a "2003 Downtown LA Business Review" produced by BMS urges its sales representatives to "target Medi-Cal MDs" for sale of the BMS antibiotic drug Tequin. BMS also tells its sales representatives to "aggressively target Medi-Cal physicians" with "funds and high volume calls towards MC [Medi-Cal] physicians" for promoting BMS' drug Avapro.

74.     BMS knew that its provision of kickbacks to these physicians was illegal and made efforts to conceal its illegal, fraudulent scheme. Had the United States known that these prescriptions were written due to a fraudulent kickback scheme, the United States would not have provided reimbursement for these prescriptions.

### A. Gifts to High Prescribing Physicians

75.     During the time Mr. Wilson served as a sales representative for BMS, BMS instructed him to make thousands of payments for the purpose of encouraging doctors

either to prescribe or to recommend the prescription of BMS drugs—among them, Pravachol, Plavix, Glucovance, Glucophage, Avapro, and Monopril. He was also instructed to encourage and reward doctors by providing them with gifts. BMS directed its sales representatives to particularly target doctors who were high prescribers and who had a large population of Medicaid patients. Mr. Wilson and other BMS sales representatives gave gifts, liquor, gift cards, and entertainment tickets to these doctors, and charged all of it as "direct marketing expenses" or "DMEs." This conduct was encouraged and condoned by BMS.

76. In 2000, BMS presented to the sales representatives in Mr. Wilson's pod the 2000 Downtown LA Business Plan. The plan directed sales representatives to procure tickets for Los Angeles Lakers basketball games and Los Angeles Kings professional hockey games and provide them to physicians. Sales representatives were also encouraged to arrange golf outings for physicians. The stated purpose of such entertaining was to "increase Pravachol sales" among physicians.

77. In fact, it was routine practice at BMS to treat high prescribing physicians with tickets to Los Angeles Lakers games. These physicians were routinely invited to watch home games in a luxury suite, at BMS' expense. Some doctors brought their wives and up to nine family members and friends at a time. Again, BMS covered these costs. There were no educational meetings that occurred during these games.

78. BMS also encouraged its sales representatives to arrange expensive golf outings for high prescribing doctors. On or about March 2000, BMS paid approximately $800 for a pre-paid all inclusive golf outing for Dr. Min Chai and three

- 28 -

of his friends at the Cascades Golf Club in Sylmar, California. Upon information and belief, BMS treated Dr. Chai to this golf outing in return for him writing more Pravachol prescriptions. No sales representatives were in attendance during the day of golfing and there were no medical education program or any other medical programming provided to the doctors.

79. On or about May 30, 2001, BMS paid for a sushi dinner for Dr. Michael Neumann and his wife, at a cost of $138.90. Dr. Neumann was tagged by BMS as a very high Plavix and Pravachol prescriber.

80. On or about July 20, 2001, pursuant to instructions from BMS management, Mr. Wilson purchased 12 tickets to the Los Angeles Philharmonic for four doctors and their wives at a price of $984.90. The purpose of this gift was noted as "Glucovance Pull Through," a sales effort directed at increasing prescriptions of the BMS diabetes drug. The physicians who received these tickets were all identified in other BMS documents as high volume prescribers with a high percentage of Medicaid patients.

81. During approximately this same time period, BMS sales representatives were instructed to organize lavish lunches and drinks at a cigar shop owned by Dr. Jacob Orphari's brother in order to encourage Dr. Orphari to write prescriptions for BMS products. The sales representatives in Mr. Wilson's pod spent in total approximately $1200 on food, cognac and cigars. Their district manager at the time attended the lunches and approved the expense reports.

82. On or about December 17, 2002, Mr. Wilson was ordered by his district business manager to buy Christmas gift baskets for 12 high prescribing and influential

physicians, despite the fact that he complained that it would look inappropriate to give such gifts. Mr. Wilson eventually spent $754.80 on the 12 gift baskets. Seven of the 12 physicians who received the baskets were noted by BMS to be high Medicaid prescribers.

83. A 2003 California Pravachol Fortune Five Plan TalkPoint document prepared by BMS management instructs sales representatives to invest "direct marketing expense" funds on targeted Fortune Five "START" physicians. "START" physicians are those who have been targeted for sales work based on prescription volume.

84. Based on similar instructions from BMS, in or about August 2001, Mr. Wilson bought $122.14 in liquor for high prescribing Medicaid doctors and billed it to the BMS "Pravachol DME account." On or about January 23, 2002, Mr. Wilson bought liquor in the amount of $34.04 for a high prescribing Medicaid doctor. The receipt for the liquor was submitted for the "Pravachol DME account."

**B. Monetary Incentives for High Prescribing Physicians**

85. BMS also sought to influence physicians to prescribe its products by giving them cash payments. BMS knew that these cash payments were illegal and violated anti-kickback laws. BMS also knew that its kickback scheme was not covered by the safe harbor provisions of those laws. BMS was aware that its payments did not comply with the guidelines of the American Medical Association for payments to physicians. BMS was also aware of the Inspector General's Special Fraud Alert, which raised particular concerns about drug marketing. In response to all of this, rather than curbing

its kickback payments, BMS used elaborate schemes to conceal the nature of these payments. Specifically, among other schemes, BMS used sham preceptorships, consultancies, and "speakers bureaus" to funnel money to high prescribing Medicaid doctors.

86. Ostensibly, the point of a preceptorship program is to allow a sales representative to shadow a physician during her day to better understand her patient population or needs. However, BMS used preceptorships to channel money to physicians. BMS would pay physicians for preceptorships, but the sales representative would not "shadow" the doctor for the day; rather, the representative would just hand over the check to the doctor.

87. BMS' 2000 Downtown plan calls for sales representatives to initiate "preceptorships with influential physicians" in order to "increase Avandia sales."

88. BMS also founded a speaker's bureau as another method to make large and numerous payments to influential physicians who recommended BMS drugs at teleconferences, dinner meetings, consultant meetings, educational seminars and other events. These speakers repeatedly gave short presentations relating to BMS drugs for which they were paid anywhere from $700 to $2,500 per event. BMS targeted opinion leader physicians, some of whom were high prescribers and some of whom were influential in their communities. The payments that these doctors received were far in excess of the fair value of the work they performed for BMS. Speakers who most zealously advocated BMS drugs were hired most frequently for speaking events, notwithstanding the fact that many of these events purported to be independent medical

education seminars where independent information was supposed to be delivered.

89.     For example, BMS paid Dr. Myunghae Choi $1,000 to speak at a dinner program at a lavish restaurant called Ca'Brea in Los Angeles on or about October 16, 2002 regarding "The Management of Acute Coronary Syndrome."  Dr. Choi was considered a Top Medi-Cal prescriber by BMS, was on several targeted lists for drug promotions, received an expensive gift basket as a gift for Christmas in 2002, was on the Pharmaceuticals and Therapeutics Committee for St. Vincent's Hospital, and assisted in getting BMS drugs on the hospital formulary.

90.     Dr. Raj Makkar was paid $2,500 to give a Plavix presentation at a lavish dinner at A.O.C. in Los Angeles in or about 2003.  His slide show was provided to him by BMS' marketing department.  BMS marketing items, such as Plavix napkins and notepads, were placed on the table.  Doctors were told that they could bring their spouses.  The total cost of food and liquor—completely paid for by BMS—was about $4,500.

91.     BMS also funneled illegal payments to physicians to encourage them to prescribe off-label by using  "consultants" meetings. Pursuant to this scheme, BMS recruited physicians to dinners or conferences and paid them to hear presentations about off-label uses of BMS drugs. Under the guise that these doctors were acting as "consultants," BMS sometimes had the doctors sign sham "consulting agreements." However, the doctors never actually acted as consultants to or for BMS.  Instead, at the consultants meetings, BMS would give physicians presentations related to  BMS drugs, sometimes regarding off-label usage.   The presentations would be made by BMS

employees or physician speakers hired by BMS for the purpose of promoting BMS drugs.

92.    For example, BMS invited high prescribing physicians to attend a two-day program at a resort in La Jolla, California on or about June 29-30, 2002. BMS paid these physicians honoraria to attend educational seminars on the use of Pravachol in the diabetic population.

93.    On or about May 31, 2001, BMS organized a "Clinical Advisory Council" meeting at Nick & Stef's Steakhouse.  There, attendees were treated to a lavish meal, a $250 honorarium each for attending, and were to listen to "new information related to cholesterol management and acute coronary syndromes."  Physicians were anticipated to give "suggestions on sales training."

94.    Although physicians were not supposed to bring their spouses or guests to these events, the physicians frequently did so, and BMS always paid for the additional dinners.  Moreover, although physicians were supposed to "advise" or "consult" with BMS employees at these dinner meetings, they frequently did not bother to fill out the questionnaires that were brought for them.

95.    Indeed, the BMS consultant meetings were not held for the purpose of providing BMS with expert, independent advice. In many cases, BMS employees filled out the "expert" questionnaires for the doctors, after the doctor signed the signature line. Any data actually filled out on a questionnaire by a physician was turned over to BMS marketing to determine how to better sell drugs to that physician; it was not used as "independent expert advice" on scientific matters.

96. As an example of how the consultant meetings were geared towards driving increased prescriptions, a May 16, 2003 memo regarding a two-day BMS event at a resort hotel in Santa Barbara is enlightening. The memo instructs sales representatives to invite top prescribers in their area to the June 21-22 event, which was being held at a $350-a -night hotel. Physicians would get a $250 honorarium to attend, plus meals and the hotel stay. BMS' instructions to its sales representatives state, "As you know, physicians that attend these types of programs come back very motivated to prescribe Pravachol."

97. In fact, BMS routinely analyzed whether the "consultants" meetings were successful in getting attendees to change their prescription writing practices. Physicians at BMS dinner and resort meetings were asked to write more BMS drug prescriptions. BMS marketing and management routinely tracked the prescription patterns of physicians who attended their dinners and meetings. Physicians were made aware by sales representatives that they would not continue to be invited to lavish dinners and resort weekends if they did not remain in the high prescriber range, and if they did not prescribe BMS drugs. Physicians who did not continue to prescribe BMS drugs were tracked on a weekly basis by BMS marketing and sales personnel, and were sometimes penalized by being taken off target lists for invitations to future dinners and resort weekends.

98. Another scheme employed by BMS to funnel monetary payments to high prescribing Medicaid physicians consisted of remuneration for "detailing." Under this scheme, BMS would provide physicians gift certificates to online medical supply stores

or direct cash payments of up to $500 to watch a sales representative flip through a book of promotional drug "visuals." Supposedly, the sales representative was supposed to elicit "feedback" on the quality of the presentation. However, in reality, no data was gathered or analyzed, and the entire purpose of the activity was to pay the physician in order to increase drug prescriptions.

99.    BMS also gave physicians gift certificates to online medical supply stores and direct cash payments to attend "webinars" from the comfort of their own offices or to participate in teleconferences.

### C. Meetings and Events for High Prescribing Physicians

100.    In addition to providing physicians with lavish dinners at consultants meetings and speaking events, BMS also sought to influence physicians' prescription-writing practices by inviting doctors to weekend resort events, known as "drive tos" or "fly tos." Only high prescribing doctors were invited to such events.

101.    For example, on or about June 28, 2002, BMS organized a San Diego Regional Consultant Conference, at which attendees got a free night's stay at a hotel, paid dinners, a $250 honorarium check, and could bring their spouses. BMS assigned its sales representatives the names of physicians to invite, and were told that the names were based on prescription volume. BMS told its sales representatives that only those doctors on the list provided by BMS would be allowed to attend the event. These physicians were required to sign a consultant agreement and fill out a market research questionnaire while at the meeting.

102.   On or about May 22, 2003, BMS organized a continuing medical education program on lipid lowering management in New Orleans, entitled "From Benchtop to Bedside."    BMS flew physicians to this program, provided them with hotel accommodations and meals and honoraria to attend.

103.   On or about June 21-22, 2003, BMS organized a "drive-to" event for physicians at the Bacara Resort in Santa Barbara.   BMS paid $350/night for each physician to stay at the resort, paid each attending physician a $250 honorarium, and provided paid meals. Attending physicians were allowed to bring a guest, who was also fully paid for by BMS.   BMS told its sales representatives that the event would "motivate" physicians to "prescribe Pravachol."   BMS instructed sales representatives that only targeted physicians would be invited, and that the criteria for choosing these physicians was based on Pravachol prescription volume and overall drug class volume. The target invitation list included a large number of downtown Los Angeles very high prescribers.

104.   On or about July 28, 2003, due to concerns about HHS OIG compliance, BMS sent a memo to all sales personnel suspending all preceptorships, clinical advisory councils, and all grant requests originating from marketing.   Despite this memo, management continued to direct sales representatives to target high prescribing doctors by using preceptorships and paid dinners.   For example, in or about March 2004, Mr. Wilson's district business manager directed him to set up a lavish dinner for pharmacists to promote Plavix as an off-label replacement for Pletal in the treatment of numbing and tingling associated with PAD. Mr. Wilson set up the dinner on or about

June 8, 2004 at a lavish Los Angeles restaurant called Katana.

### D. Grants to Physicians as Inducement to Prescribe BMS Drugs

105.   BMS also paid outright grants to physicians to promote and prescribe BMS' drug products.  For example, in 1999-2000, BMS paid a $200,000 educational grant to Dr. Norman Lepor's Save the Heart Foundation.  In exchange, Dr. Lepor used his influence on the Cedars-Sinai Medical Center Pharmaceuticals and Therapeutics Committee to get BMS drugs on the Cedars-Sinai formulary.  This meant that BMS would receive a large boost in prescriptions from this very active hospital with a large Medicaid population.

106.   Around 2001, at the time of the Glucovance blood sugar control drug launch, BMS made a $3,000 educational grant to Dr. Yong Lee for his medical website. This grant was given to Dr. Lee for the purpose of influencing him to write a high volume of prescriptions of Glucovance at the time of launch.  Dr. Lee had a very large Medicaid patient population.

107.   BMS' purpose in encouraging Dr. Lee to write Glucovance prescriptions was to ensure that Glucovance would be put on the Medi-Cal primary drug list.  Upon information and belief, all drugs upon launch are placed on the Medi-Cal formulary. Medi-Cal then closely monitors prescription writing for the first six months following the drug's launch and takes into account the number of prescriptions written in deciding whether to put the drug on the formulary.  BMS therefore paid kickbacks to doctors during the critical six-month period following a drug launch in order to ensure the

1    drug's placement on Medi-Cal primary.

2

3        **E. Sample Dumping**

4

5        108.  BMS often used the provision of free samples to influence physicians to

6    prescribe BMS products.  For example, BMS instructed Mr. Wilson's pod to provide

7    enormous quantities of samples to several outpatient clinics in downtown Los

8    Angeles—one owned and operated by BAART and the other two owned and operated

9    by QueensCare.  The BAART clinic was located at 1926 W. Beverly Blvd., Los

10   Angeles, California.  The QueensCare clinics were located at 3242 W. 8th Street and

11   4618 Fountain Ave., Los Angeles, California.  These clinics had very significant

12   populations of Medicaid patients.  BMS' purpose in "dumping" samples on these clinics

13   and in other neighborhoods with a large percentage of Medicaid subscribers was to

14   influence in-house pharmacists and physicians to prescribe BMS drugs to this

15   population of patients.  A November 2002 BMS Plan of Action lists as a "resource"

16   Pravachol samples to be distributed in high prescribing Medicaid areas, such as Cedars-

17   Sinai, Korea-town, and Armenia-town.

18

19       109.  BMS actually tracked the return on investment of dropping samples with

20   physicians.  BMS' "Plavix 2004 Business Plan" contains a "Samples Optimization"

21   page.  On this page, doctors are tracked for the return on investment of samples,

22   meaning each doctor is listed with the number of samples provided to him, the number

23   of prescriptions he actually wrote, and a number representing the "return on

24   investment" (or "ROI").  Mr. Wilson was frequently shown such charts by BMS

management, and sales representatives were directed to drop more samples with the higher "ROI" doctors and fewer samples with lower "ROI" doctors.

### F. BMS Monitored the Effect of Its Kickback Scheme and Expected Quid Pro Quo from Doctors

110. BMS specifically used these kickback schemes to induce doctors to write prescriptions for BMS products and to reward them for doing so. BMS elicited from doctors assurances that they would increase their prescription-writing in exchange for the gifts and payments detailed above. BMS tracked the prescription-writing habits of its physicians on a monthly basis. BMS marketing and sales strategy documents show that at least on a monthly basis, BMS tracked prescription volume by physician, tracked each physician's percentage of Medicaid prescriptions, and tracked the percentage change in the prescribing habits of physicians.

111. A BMS sales plan called "Rounding up the Docs!" instructs BMS sales representatives at dinner events to "Gain commitment to prescribe in specific patient types!" It goes on to direct them to "monitor Weekly NRx [number of new prescriptions, by doctor] reports and Weekly Prescriber Reports to evaluate the success of the program," and then "Hold customers accountable." By "hold customers accountable," BMS meant that if the physician did not increase her prescriptions, the sales representative was to warn her that she would no longer receive samples, and that the sales representative would reduce the number of gifts to the physician and would reduce or cut out invitations to dinner events, fly-to resort events, and other perquisites. BMS sometimes referred to these tactics as "shaking the doctors down." Sales

representatives were told specifically to ask physicians, "We've done all these things for you – why aren't we getting your business?"

### G. BMS' Payment of Kickbacks to Influence Formulary Decisions

112.   BMS not only used kickbacks to influence the prescription-writing habits of physicians, but it also used kickbacks to influence formulary decisions.  For example, on or about June 23, 2000, BMS presented to its sales representatives the California Project G.A.P. Glucovance Accelerated Plan, which called for targeting physician members of the formulary committees at community hospitals.

113.   In or about October 2002, BMS paid Dr. Myunghae Choi $1,000 to speak at a dinner program at a lavish restaurant called Ca'Brea in Los Angeles.  Dr. Choi was considered a Top Medi-Cal prescriber by BMS, was on several targeted lists for drug promotions, received an expensive gift basket as a gift for Christmas in 2002, was on the Pharmaceuticals and Therapeutics Committee for St. Vincent's Hospital, and assisted in getting BMS drugs on the hospital formulary.

114.   Another doctor that BMS sought to influence with kickbacks was Dr. Norman Lepor.  Dr. Lepor served on the Pharmaceuticals & Therapeutics Committee of Cedars-Sinai Medical Center, the largest nonprofit hospital in the Western United States.  The Pharmaceuticals & Therapeutics Committee decided which drugs would appear on the formulary of Cedars-Sinai.  As set forth above, in 1999-2000, BMS gave Dr. Lepor a $200,000 educational grant for his Save the Heart Foundation.  In 2002, BMS sent Dr. Lepor an expensive gift basket, which was written off as a BMS direct marketing expense.  Mr. Wilson also procured several gift cards for "Cedars-Sinai Hospital," all of

which were considered BMS direct marketing expenses. For example, in December 2000, Mr. Wilson purchased $200 worth of gift cards from Borders bookstore for Cedars-Sinai hospital. A receipt from January 19, 2001 shows Mr. Wilson purchased $100 in gift cards from Borders bookstore for Cedars-Sinai Hospital. Another receipt from April 5, 2002 shows a similar expense of $200 on gift cards from Borders books for Cedars-Sinai hospital. On or around January 23, 2002, Mr. Wilson also purchased Starbucks gift cards for physicians, including Dr. Lepor at Cedars-Sinai hospital. Dr. Lepor also served as a habitual BMS speaker for Avapro and Plavix and was paid honoraria for these services.

115. Upon information and belief, in exchange for these gifts and payments, Dr. Lepor used his influence on the Cedars-Sinai Medical Center Pharmaceuticals and Therapeutics Committee to get BMS drugs on the Cedars-Sinai formulary. This meant that BMS would receive a large boost in prescriptions from this very active hospital with a large Medicaid population.

116. BMS also directed its sales representatives to give gifts, lavish dinners, entertainment and cash payments to physicians in order to gain their agreement to write prescriptions for drugs that were not on approved formularies, including the Medicaid and state formularies. Physicians were asked, in return for these dinners, gifts, entertainment and cash, to submit Medicaid TARs (Treatment Authorization Requests) for BMS drugs that were not on the Medicaid formulary; to write Medicaid prescriptions accompanied by a "dispense as written" note to the pharmacist in order to get the prescriptions filled despite not being on the formulary; and to write prior

authorization paperwork to Medicaid for BMS drugs that were not on the formulary.

117.   BMS management directed sales representatives to create a false impression of drug popularity to the Medicaid administration in order to get BMS drugs on the Medicaid formulary. BMS targeted select, high volume prescribers with gifts, cash, lavish dinners and entertainment in order to get them to write a large number of TARs for drugs that were not yet on the Medicaid formulary. BMS management knew that Medicaid tracked the number of TARs and viewed these as a sign that new drugs were becoming popular among their physicians.  BMS also knew that Medicaid would often put drugs with large enough numbers of TARs onto its formularies. By paying these kickbacks to influence the number of TARs written, BMS attempted to manipulate the Medicaid formulary so that more BMS drugs would be prescribed and paid for by Medicaid.

118.   BMS management directed sales representatives to give physicians gifts, cash, lavish dinners and entertainment in order to keep BMS drug prescriptions at a high enough volume to maintain them on formularies once the formulary status had been obtained. BMS management also directed sales representatives to provide physicians with gifts, cash, lavish dinners and entertainment in order to keep BMS drugs high on the formulary "tiers" of drugs that may be prescribed, or to move them up to a higher "tier" based on volume of drugs prescribed. The higher the tier, the more likely a drug is to be prescribed as a first-line treatment on that formulary.

119.   BMS sales representatives also provided physicians with samples as an incentive to write prescriptions for BMS drugs for their Medicaid patients that were not

on the Medicaid formularies.

120.   The Medicaid Anti-Kickback statue is a critical provision of Medicaid. Thus, compliance with it is material to the government's treatment of claims for reimbursement.   Had the United States and the several states known that Medicaid prescriptions for BMS drugs, including Plavix, Pravachol, Glucovance, Glucophage, Monopril, Avapro, Tequin, and Avandia, had been written because physicians had been paid kickbacks by BMS to do so, the United States and the several states would not have provided reimbursement for these prescriptions.   To do so, would put the government in the position of funding illegal kickbacks after the fact.

121.   Moreover, the kickbacks described in this complaint are strictly illegal and have had the direct effect of greatly increasing the amount of Plavix, Pravachol, Glucovance, Glucophage, Avapro, Monopril, Tequin and Avandia prescriptions and the indirect effect of increasing the amount of money spent by the federal government for reimbursement of prescriptions covered by Medicaid. The payment of these kick-backs represents the inducement of federal payments through a pattern of fraudulent conduct and constitutes false claims within the meaning of 31 U.S.C. § 3729.

**Best Price Violations**

122.   In 1965, Congress enacted Title XIX of the Social Security Act which established the "Medicaid" program to expand the nation's medical assistance program for the needy. 42 U.S.C. §§ 1396-1396v.   The Medicaid program is funded by both federal and state monies, collectively referred to as "Medicaid Funds," with the federal contribution computed separately for each state.   42 U.S.C. §§ 1396b; 1396d(b).   Each

state is permitted, within certain parameters, to design its own medical assistance plan, subject to approval by HHS. 42 U.S.C. § 1396a. Among other forms of medical assistance, the states are permitted to provide medical assistance form the Medicaid funds to eligible persons for outpatient prescription drugs. 42 U.S.C. §§ 1396a(10)(A); 1396d(a)(12).

123. Health and Human Services ("HHS") is the agency of the United States responsible for the administration, supervision, and funding of the federal Medicaid program. The Center for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA") is a division of that agency that is directly responsible for administering the federal Medicaid program, including review and approval of the individual state medical assistance plans.

124. In 1990, Congress enacted the Medicaid Rebate Program, 42 U.S.C. § 1396r-8. Under this program, each drug manufacturer voluntarily entered into an agreement with CMS in which it agreed to pay rebates to the states based on the utilization of its drug products in exchange for having those drug products covered by the state plans and reimbursed through Medicaid Funds, 42 U.S.C. § 1396r-8(a)(1).

125. Under the Medicaid Rebate Program and the rebate agreement with CMS, among other responsibilities, a participating drug manufacturer was required to:

> (1)    report to CMS on a quarterly basis its "best price" for single source and innovator multiple source drugs, defined as "the lowest price available from the manufacturer during the rebate period to any wholesaler, retailer, provider, health maintenance organization, non-profit entity or

governmental entity within the United States," with certain specified statutory exclusions. 42 U.S.C. § 1396r-8(c)(1); and

(2)    pay to each state plan a quarterly rebate with respect to single source and innovator multiple source drugs equal to the product of (a) the units of each dosage form and strength paid for under the state plan during the rebate period as reported by the state, and (b) the greater of (I) the difference between the average manufacturer price and the best price, or (ii) a minimum rebate percentage of the average manufacturer price. 42 U.S.C. § 1396r-8(c)(1)(A).

126.   At all relevant times BMS was subject to a rebate agreement with CMS, and BMS' drug products were at all relevant times covered by state Medicaid plans that provided medical assistance for outpatient prescription drugs.    42 U.S.C. §§ 1396(a)(1)(A), 1396d(a)(12), 1396r-8(a)(1).   Under the Medicaid Rebate Program and rebate agreement with CMS, BMS agreed: (1) to report quarterly to CMS its average manufacturer price and best price for its drug products; and (2) to pay quarterly rebates to the states as described above.

127.   In 1992, Congress enacted Section 340B of the Public Health Service ("PHS") Act, known as the Drug Pricing Program, to provide drug price protection for certain PHS entities that receive federal funds. 42 U.S.C. § 256b.  PHS entities include such safety net programs as state-operated AIDS drug purchasing assistance programs, disproportionate share hospitals, and other entities defined in the Drug Pricing Program. 42 U.S.C. § 256b(a)(4).

128.   At all relevant times, BMS participated in the Drug Pricing Program, 42 U.S.C. § 256b, which is part of the Public Health Service Act ("PHSA"), 42 U.S.C. §§ 201-300GG-92.   As a participant in the Drug Pricing Program, BMS entered into an agreement with HHS in connection with the pricing of its drug products sold to PHS entities.   Under the Drug Pricing Program and its agreement with HHS, BMS generally agreed that the mount that BMS required the PHS entities to pay for drug products would not exceed the average manufacturer price, as reported by BMS to CMS in the previous calendar quarter, minus a specified rebate percentage that was derived in part from the Medicaid rebate paid by BMS in the preceding calendar quarter for each drug, as further described in 42 U.S.C. § 256b(a).

129.   During the time of Mr. Wilson's employment with BMS, BMS' basic sales organization was a "pod."   Pods consisted of groups of sales representatives promoting the same drugs in the same geographical territory.   Mr. Wilson's pod included three outpatient clinics—one owned and operated by BAART and the other two owned and operated by QueensCare.   The BAART clinic was located at 1926 W. Beverly Blvd., Los Angeles, California.   The QueensCare clinics were located at 3242 W. 8th Street and 4618 Fountain Ave., Los Angeles, California.

130.   As already described above, Mr. Wilson and members of his pod routinely delivered massive amounts of samples of Pravachol, Plavix, and Glucophage to the BAART and QueensCare clinics, per instructions from management at BMS.   The samples were either delivered straight to the clinics' pharmacies or were given to physicians at the clinics.   Upon information and belief, the clinics would often

repackage these samples and give them to Medicaid patients and then charge Medicaid for the prescriptions.

131.   As already discussed, BMS provided these samples to the clinics in order to induce physicians working at the clinics to prescribe additional BMS products, including, among others, Plavix, Pravachol, Glucovance, Glucophage and Monopril.

132.   BMS sought to conceal the volume of drugs provided to the clinics.  BMS accomplished this concealment by instructing its sales representatives to take sample cards that other physicians not at these clinics had already signed for receipt of sample drugs and insert new, higher numbers of samples.  By falsifying the sample cards, BMS made it appear as though large amounts of samples were being spread among a larger number of physicians.

133.   This scheme was known to BMS management, as the sales representatives in Mr. Wilson's pod discussed it openly in front of BMS sales manager Kimberley Johnson.

134.   Mr. Wilson is informed and believes and based thereon alleges that the volume of drugs delivered to the QueensCare and BAART clinics was so great that it effectively lowered the best price of Pravachol, Plavix, and Monopril below the best price BMS reported to CMS.

135.   Moreover, BMS engaged in a scheme to manipulate the average wholesale price of drugs it provided to BAART and QueensCare.  In order to ensure that BAART and QueensCare would continue to prescribe and dispense BMS pharmaceuticals, BMS entered into agreements with these entities that provided them a minimum of $1 profit

per drug.

136.   In pursuing the scheme hereinabove alleged, BMS submitted false records to CMS, which caused Medicaid to overpay for these drugs, to the damage and detriment of the United States and the various states.

**Retaliation/Wrongful Termination**

137.   In or around March or April 2002, Michael Wilson became aware that there were company-wide problems with tracking samples.

138.   The manner in which pharmaceutical samples are to be stored, handled, and accounted for is governed by the Prescription Drug Marketing Act (PDMA), enacted in 1988 and incorporated into the Food, Drug & Cosmetic Act at 21 U.S.C. § 331 et seq. The FDA's regulations implementing this law are at 21 CFR Part 203 et seq.   In particular, 21 CFR §§ 203.32 & 203.60 set forth the requirements for storing, maintaining, handling, and accounting for these drugs.

139.   In order to comply with the PDMA and the relevant regulations, pharmaceutical companies like BMS must be able to account for all samples given to physicians.   In or about March or April 2002, Mr. Wilson found out that there were company-wide irregularities with respect to tracking these samples.   In particular, he noticed that reports generated by the company never matched his own accounting of samples distributed.   Moreover, an auditor revealed to Mr. Wilson that this was the case with many or most sales representatives.

140.   Thereafter, Mr. Wilson complained to BMS human resources, a BMS

ombudsman, and his superiors, both orally and in writing, of these practices, which violated the PDMA and other relevant statutes and regulations. Mr. Wilson also contacted the FDA by telephone and electronic mail to voice his concerns about these issues.

141. In retaliation for these actions, BMS made Kimberley Johnson Mr. Wilson's supervisor. She immediately began a campaign to harass and intimidate him. In particular, she cut his expense account budget and did not do so for other sales representatives in Mr. Wilson's region. She also managed him differently from other representatives, requiring him to submit a report of his calls to her by 6:00 PM every Friday every week. She did not require other sales representatives in Mr. Wilson's region to do so.

142. In or about May 2003, BMS made it clear to its sales representatives that they were to begin to market Pravachol for use in diabetics, an off-label use of the drug. In or about August 2003, the FDA sent a letter about its concerns with such off-label marketing to BMS. Nevertheless, thereafter BMS continued to market Pravachol for use in diabetics, as set forth above.

143. In or about October 2003, Michael Wilson complained about BMS' continued off-label marketing to Kimberley Johnson and Jeff Smith, the Assistant to the Regional Vice President of BMS. Mr. Wilson also voiced concern about BMS' use of kickbacks.

144. Again, in retaliation for these complaints, he was subjected to further harassment and intimidation. His budget was cut further and he continued to be treated

differently from other sales representatives in his region.

145.   For example, other sales representatives in his region were allowed to take vacations or miss meetings in order to accommodate night school or other study programs.   In or about 2003, Mr. Wilson was enrolled in law school and was taking classes at night.   Shortly after complaining about BMS' off-label promotions, Mr. Wilson was required, along with other sales representatives in his region, to attend a regional sales meeting in Newport Beach. He asked for permission to leave the meeting early in order to attend classes. Both Tracie Ferguson, a Regional Vice President, and Kimberley Johnson refused to give Mr. Wilson permission to leave the meeting early. Nevertheless, they gave permission to another sales representative to leave early to attend a business school class.

146.   In or about March 22, 2004, Kimberley Johnson met with Mr. Wilson and had him read and sign a "Letter of Concern/Written Warning."   She accused Mr. Wilson of non-compliance in resolving sample inventory variances, as well as insubordinate behavior.

147.   As part of the "Expectations" which he had to meet in order to avoid "probation and/or termination," Mr. Wilson was expected to complete all leadership responsibilities for programs and be in attendance for those programs you are point for. Mr. Wilson was also required to distribute samples to "high writing START physicians and non-START physicians as needed."   In other words, as a condition for continuing his employment with BMS, Mr. Wilson was required to continue to be involved in BMS' kickback scheme.

148.   Mr. Wilson was also required to continue to market BMS products, namely Pravachol and Plavix, for off-label uses.   Specifically, in about May 2004, BMS required Mr. Wilson to take responsibility for the "Health Care Partners Plavix 30/60/90 Day Action Plan," which entailed convincing members of an insurance group to put Plavix on its formulary.   As part of the plan, Mr. Wilson was required to set up seminars, speaking programs, teleconferences and meals on off-label uses of Plavix and to provide payments and other incentives to members of the formulary committee of Health Care Partners to attend these seminars and speaking programs.   Although Mr. Wilson voiced concern that such actions would violated OIG guidelines and possibly federal law, he was told that he had to initiate the program in order to keep his job.

149.   In July 2004, BMS announced that it would be restructuring its sales force and would announce lay-offs the morning of September 22, 2004.   All sales representatives were told to wait by the telephone that morning to find out their employment status. Mr. Wilson was not contacted that morning and was not terminated as part of this lay-off.   Instead, later on September 22, 2004, Mr. Wilson was told to drive down to BMS' regional office in Alisio Viejo, California.   He drove there on September 23, 2004.   On that day, James Main, the Regional Vice President of BMS, terminated Mr. Wilson. Mr. Wilson was not given a severance package, as the other sales representatives who had been laid off the previous day had been.

150.   BMS' stated reason for terminating Mr. Wilson was that he violated the PDMA.   BMS alleged that Mr. Wilson had altered a sample accountability card.   In fact, the incident in question occurred a year earlier, on or about October 18, 2003.   On

that day, Mr. Wilson dropped of samples at a doctor's office.  The doctor initially represented that he wanted six samples, so Mr. Wilson filled out a sample accountability card indicating that six samples had been left.  Before Mr. Wilson left, however, the doctor changed his mind and indicated that he wanted eight samples. Instead of filling out a new card as required by the PDMA, Mr. Wilson crossed out the number "six" and wrote "eight" in its place.  This practice was rampant at BMS and BMS regularly condoned it.  All of the sales representatives followed the same practice and Mr. Wilson had done this many times in front of his district managers without receiving any criticism or complaints about his conduct.

## COUNT ONE

## FEDERAL FALSE CLAIMS ACT VIOLATIONS FOR CAUSING SUBMISSION OF OFF-LABEL PRESCRIPTIONS  (31 U.S.C. §3729)

151.  Relator re-alleges and incorporates the allegations in paragraphs 1- 150 as if fully set forth herein.

152.  By presenting physicians with false information about off-label uses of its pharmaceuticals and encouraging physicians to write prescriptions for such uses which were not approved by the FDA or any relevant drug compendium, BMS caused physicians to submit numerous prescriptions for Glucophage, Plavix and Pravachol that were ineligible for reimbursement under Medicaid because they were prescribed for an off-label use.  Thus, BMS knowingly caused such physicians and pharmacists expressly or impliedly to make false certifications about the pharmaceuticals' indications and efficacy, both in the writing of prescriptions for off-label uses of BMS drugs and in

preparing false and fraudulent prior authorizations, treatment authorization requests, and "dispense as written" prescriptions. BMS therefore caused the submission of false claims for payment of money under the federal Medicaid program. Had the United States known that the prescriptions BMS caused to be written were for unapproved, off-label uses, and had it known that the information on prior authorizations and TARs had been falsified, the United States would not have provided reimbursement for such prescriptions under its Medicaid plan.

153.   This course of conduct violated the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

154.   The United States, unaware of the falsity of the claims, and in reliance on the accuracy thereof, made payment upon the false or fraudulent claims and was therefore damaged.

## COUNT TWO

### BMS' SCHEME WITH RESPECT TO OFF-LABEL PRESCRIPTIONS AS CONSPIRACY TO SUBMIT FALSE CLAIMS, 31 U.S.C. § 3729(A)(3)

155.   Relator re-alleges and incorporates the allegations in paragraphs 1- 154 as if fully set forth herein.

156.   BMS combined, conspired, and agreed together with physicians, pharmacists, and others to defraud the United States by knowingly causing false claims to be submitted to the United States for the purpose of having those claims paid and ultimately profiting from those false claims. BMS committed other overt acts set forth above in furtherance of that conspiracy, all in violation of 31 U.S.C. § 3729(a)(3),

causing damage to the United States.

## COUNT THREE

## FEDERAL FALSE CLAIMS ACT VIOLATIONS BASED ON THE PAYMENT OF KICKBACKS (31 U.S.C. §3729)

157. Relator re-alleges and incorporates the allegations in paragraphs 1- 156 as if fully set forth herein.

158. BMS' payment of kickbacks to physicians and pharmacists violated the Medicaid Anti-Kickback statute and caused false claims to be submitted to the federal government.   Since the Medicaid Anti-Kickback statue is a critical provision of Medicaid, compliance with it is material to the government's treatment of claims for reimbursement.   Had the United States and the several states known that Medicaid prescriptions for BMS drugs, including Plavix, Pravachol, Glucovance, Glucophage, Monopril, Avapro, Tequin, and Avandia, had been written because physicians had been paid kickbacks by BMS to do so, the United States would not have provided reimbursement for these prescriptions.   As the United States was unaware of the illegality of the claims, and in reliance on the accuracy and legality thereof, made payment upon the false or fraudulent claims, the United States was damaged.

159. The kickbacks described herein are strictly illegal and have had the direct effect of greatly increasing the amount of Plavix, Pravachol, Glucovance, Glucophage, Avapro, Monopril, Tequin and Avandia prescriptions and the indirect effect of increasing the amount of money spent by the federal government for reimbursement of prescriptions covered by Medicaid. The payment of these kick-backs represents the

inducement of federal payments through a pattern of fraudulent conduct and constitutes

false claims within the meaning of 31 U.S.C. § 3729.

## COUNT FOUR

### BMS' PAYMENT OF KICKBACKS AS CONSPIRACY TO SUBMIT FALSE CLAIMS, 31 U.S.C. § 3729(A)(3)

160.   Relator re-alleges and incorporates the allegations in paragraphs 1- 159 as if fully set forth herein.

161.   BMS combined, conspired, and agreed together with physicians, pharmacists, and others to defraud the United States by knowingly causing false and illegal claims to be submitted to the United States for the purpose of having those claims paid and ultimately profiting from those false claims.  BMS committed other overt acts set forth above in furtherance of that conspiracy, all in violation of 31 U.S.C. § 3729(a)(3), causing damage to the United States.

## COUNT FIVE

### FEDERAL FALSE CLAIMS ACT VIOLATIONS BASED ON BEST PRICE VIOLATIONS (31 U.S.C. §3729)

162.   Relator re-alleges and incorporates the allegations in paragraphs 1- 161 as if fully set forth herein.

163.   By purposefully flooding several clinics with free samples, BMS effectively lowered the best price of Pravachol, Plavix, and Monopril below the best price BMS reported to the Center for Medicaid and Medicare Services, thereby causing financial loss to the United States.  BMS' report of best prices to the CMS constituted submission of false statements.  Moreover, the fraudulently concealment of its activities constituted the submission of false claims to the United States.  The United States was harmed

- 56 -

because it did not benefit from the best price as mandated by the Drug Pricing Program and other relevant statutes and regulations, and because BMS' false statements to CMS about the best price of drugs identified herein reduced the amount of rebates BMS had to pay under the Medicaid Rebate Program.

164. BMS' course of conduct as alleged herein violated the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

## COUNT SIX
## VIOLATION OF THE RETALIATION STATUTE, 42 U.S.C. § 3730(H)

165. Relator re-alleges and incorporates the allegations in paragraphs 1- 164 as if fully set forth herein.

166. BMS retaliated against the Relator by harassing him and taking actions to prevent him from properly carrying out his job responsibilities as a result of his lawful acts done in furtherance of this action, including reporting violations of the Prescription Drug Marketing Act to the United States and BMS management and refusing to engage in BMS' scheme to promote off-label prescriptions and provide kickbacks to physicians. On September 23, 2004, the Relator was discharged from his employment by James Main, the Regional Vice President of BMS, also as a result of his lawful acts done in furtherance of this action, as set forth above. This discharge was in violation of 31 U.S.C. § 3730(h).

167. As a direct and proximate result of this unlawful and discriminatory discharge, Relator has suffered emotional pain and mental anguish, together with serious economic hardship, including lost wages and special damages associated with his efforts to obtain

alternative employment, in an amount to be proven at trial.

## PRAYER FOR RELIEF UNDER THE FEDERAL FALSE CLAIMS ACT

Relator respectfully requests this Court to enter judgment against defendants, as follows:

(a)    That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged within this Complaint, as the Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.* provides;

(b)    That civil penalties of $10,000 be imposed for each and every false claim that defendant presented to the United States;

(c)    That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d)    That the Court grant permanent injunctive relief to prevent any recurrence of violations of the False Claims Act for which redress is sought in this Complaint;

(e)    That the Relator be awarded the maximum percentage of any recovery allowed to him pursuant the False Claims Act, 31 U.S.C. §3730(d)(1),(2);

(f)    That this Court award such other and further relief as it deems proper.

## COUNT SEVEN

## VIOLATON OF THE CALIFORNIA FALSE CLAIMS ACT (Cal. Gov't Code § 12650 et seq.)

168.    Relator re-alleges and incorporates the allegations in paragraphs 1- 167 as if

1    fully set forth herein.

2    169.   This is a qui tam action brought by Relator and the State of California to
3
     recover treble damages and civil penalties under the California False Claims Act, Cal.
4
5    Gov't. Code § 12650 et seq.

6    170.   Cal. Gov't Code § 12651(a) provides liability for any person who—
7

8        Knowingly presents, or causes to be presented, to an officer or employee
9        of the state of any political division thereof, a false claim for payment or
10       approval;
11

12       Knowingly makes, uses, or causes to be made or used a false record of
13       statement to get a false claim paid or approved by the state or by any
14       political subdivision;
15

16       Conspires to defraud the state or any political subdivision by getting a
17       false claim allowed or paid by the state of by any political subdivision.
18

19       Is a beneficiary of an inadvertent submission of a false claim to the state or
20       a political subdivision, subsequently discovers the falsity of the claim, and
21       fails to disclose the false claim to the state or the political subdivision
22       within a reasonable time after discovery of the false claim.
23

24   171.   In addition, the payment or receipt of bribes or kickbacks is prohibited under

25   Cal. Bus. & Prof. Code §§ 650 and 650.1, and is also specifically prohibited in
26
     treatment of Medi-Cal patients pursuant to Cal. Welf. & Inst. Code § 14107.2.
27
28   172.   BMS violated Cal Bus. & Prof. Code §§ 650 and 650.1 and Cal. Welf. & Inst.

Code § 14107.2 from at least 1994 to the present by engaging in the fraudulent and illegal practices described herein.

173. BMS furthermore violated Cal. Gov't Code § 12651(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of California from at least 1994 to the present by its violation of federal and state laws, including Cal. Bus. & Prof. Code §§ 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2, the Anti-Kickback Act, the Stark Act and Best-Pricing Requirements, as described herein.

174. The State of California, by and through the California Medicaid program and other state health care programs, and unaware of BMS' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

175. Compliance with applicable Medicare, Medi-Cal and the various other federal and state laws cited herein was implied, and upon information and belief, also an express condition of payment of claims submitted to the State of California in connection with BMS' fraudulent and illegal practices.

176. Had the State of California known that BMS was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with BMS' fraudulent and illegal practices.

177. As a result of BMS' violations of Cal. Gov't Code § 12651(a), the State of California has been damaged in an amount far in excess of millions of dollars exclusive

of interest.

178. Mr. Wilson is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Cal. Gov't Code § 12652(c) on behalf of himself and the State of California.

179. This Court is requested to accept supplemental jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of California in the operation of its Medicaid program.

180. WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against BMS:

To the STATE OF CALIFORNIA:

Three times the amount of actual damages which the State of California has sustained as a result of BMS' fraudulent and illegal practices;

A civil penalty of up to $10,000 for each false claim which BMS presented or caused to be presented to the State of California;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed pursuant to Cal. Gov't Code § 12652 and /or any other applicable provision of law;

1  Reimbursement for reasonable expenses which Relator incurred in connection

2  with this action;

3

4  An award of reasonable attorneys' fees and costs; and

5

6  Such further relief as this Court deems equitable and just.

7

8  **COUNT EIGHT**

9  **RETALIATION IN VIOLATION OF THE CALIFORNIA FALSE CLAIMS ACT**

10  **(Cal. Gov't Code § 12653)**

11  181.   Relator re-alleges and incorporates the allegations in paragraphs 1- 180 as if

12
13  fully set forth herein.

14  182.  BMS   and   its   employees   harassed,   intimidated,   and   retaliated   and

15  discriminated against the Relator, and eventually forced him from his job in retaliation
16
17  for his efforts to investigate the false claims described in this Complaint.  BMS' actions

18  were carried out in violation of the California Government Code § 12653.

19  183.  As a direct and legal result of the conduct of defendant BMS, Relator has

20
21  sustained and will suffer the loss of salary and other valuable employee benefits; and

22  interest thereon.

23  184.   As a direct and legal result of the conduct of defendant BMS, Relator has

24  sustained and will suffer severe emotional distress, thereby entitling him to general
25
26  damages.

27  185.  Additionally, the actions of defendant BMS were carried out in a deliberate

28  manner in conscious disregard of the rights of the Relator and were malicious,

despicable, and were intended to harm Relator. Relator is therefore entitled to punitive damages against defendant in an amount sufficient to punish defendant and to deter future similar misconduct.

## COUNT NINE
## WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY
## (BROUGHT UNDER CALIFORNIA LAW)

186. Relator re-alleges and incorporates the allegations in paragraphs 1-185 as if fully set forth herein.

187. Defendant BMS harassed and intimidated Mr. Wilson, took adverse employment actions against him, and eventually terminated him because he refused to violate Cal. Gov't Code § 12651(a), Cal. Bus. & Prof. Code §§ 650 and 650.1, and Cal. Welf. & Inst. Code § 14107.2. BMS also terminated Mr. Wilson because he reported BMS' violations of these statutes.

188. BMS' termination of Mr. Wilson violated the policies underlying Cal. Gov't Code § 12651(a), Cal. Bus. & Prof. Code §§ 650 and 650.1, and Cal. Welf. & Inst. Code § 14107.2.

189. These policies had been articulated and were well-established at the time of Mr. Wilson's discharge.

190. The policies underlying these statutes are meant to prevent fraud in the Medicaid and Welfare systems of California. Such policies inure to the benefit of the public and are fundamental and substantial.

191.   As a direct and legal result of the conduct of defendant BMS, Relator has sustained and will suffer the loss of salary and other valuable employee benefits; and interest thereon.

192.   As a direct and legal result of the conduct of defendant BMS, Relator has sustained and will suffer severe emotional distress, thereby entitling him to general damages.

193.   Additionally, the actions of defendant BMS were carried out in a deliberate manner in conscious disregard of the rights of the Relator and were malicious, despicable, and were intended to harm Relator.  Relator is therefore entitled to punitive damages against defendant in an amount sufficient to punish defendant and to deter future similar misconduct.

194.   This Court is requested to accept supplemental jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of California in the operation of its Medicaid program.

## COUNT TEN
### VIOLATION OF THE ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT

195.   Relator re-alleges and incorporates the allegations in paragraphs 1- 194 as if fully set forth herein.  Additionally, Relator states that upon information and belief, the course of conduct described in this Complaint took place not only in Relator's region of California, but was a nationwide practice of BMS.  BMS conducts business in the State

of Illinois.  Upon information and belief, BMS' actions described herein occurred in Illinois as well.

196.   This is a qui tam action brought by Relator and the State of Illinois to recover treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175 et seq.

197.   740 ILCS 175/3(a) provides liability for any person who—

knowingly presents, or causes to be presented, to an officer or employee of the State of a member of the Guard a false or fraudulent claim for payment or approval;

knowingly makes, uses, of causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

Conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

198.   In addition, 305 ILCS 5/8A-3(b) of the Illinois Public Aid Code (Vendor Fraud and Kickbacks) prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item of service for which payment may be made in whole or in part under the Illinois Medicaid program.

199.   BMS violated 305 ILCS 5/8A-3(b) from at least 1994 to the present by engaging in the fraudulent and illegal practices described herein.

200.   BMS furthermore violated 740 ILCS 175/3(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Illinois from at least 1994 to the present by its violation of federal and state laws, including 305 ILCS

5/8A-3(b), the Anti-Kickback Act, the Stark Act and Best-Pricing Requirements, as described herein.

201.   The State of Illinois, by and through the Illinois Medicaid program and other state health care programs, and unaware of BMS' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

202.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein with an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Illinois in connection with BMS' fraudulent and illegal practices.

203.   Had the State of Illinois known that BMS was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with BMS' fraudulent and illegal practices.

204.   As a result of BMS' violations of 740 ILCS 175/3(a), the State of Illinois has been damaged in an amount far in excess of millions of dollars exclusive of interest.

205.   Mr. Wilson is a private person with direct and independent knowledge of the allegation of this Complaint, who has brought this action pursuant to 740 ILCS 175/3(b) on behalf of himself and the State of Illinois.

206.   This court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Illinois in the operation of its Medicaid program.

207.   WHEREFORE, Relator respectfully requests this Court to award the

- 66 -

following damages to the following parties and against BMS:

To the STATE OF ILLINOIS:

Three times the amount of actual damages which the State of Illinois has sustained as a result of BMS' fraudulent and illegal practices;

A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which BMS caused to be presented to the State of Illinois;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed pursuant to 740 ILCS/4(d) and/or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award of reasonable attorneys' fees and costs; and

Such further relief as this Court deems equitable and just.

## COUNT ELEVEN

## VIOLATION OF THE TEXAS FALSE CLAIMS ACT

208.   Relator re-alleges and incorporates the allegations in paragraphs 1-207 as if fully set forth herein.  Additionally, Relator states that upon information and belief, the course of conduct described in this Complaint took place not only in Relator's region of California, but was a nationwide practice of BMS.  BMS conducts business in the State of Texas.  Upon information and belief, BMS' actions described herein occurred in Texas as well.

209.   This is a qui tam action brought by Relator and the State of Texas to recover double damages and civil penalties under V.T.C.A. Hum. Res. Code § 36.001 et seq.

210.   V.T.C.A. Hum. Res. Code § 36.002, in relevant part, provides liability for any person who—

(1) knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(2) knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(3) knowingly applies for and receives a benefit or payment on behalf of another person under the Medicaid program and converts any part of the benefit or payment to a use other than for the benefit of the person on whose behalf it was received

- 68 -

\*    \*    \*

(5) except as authorized under the Medicaid program, knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program;

\*    \*    \*

(5) except as authorized under the Medicaid program, knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program;

\*    \*    \*

(9) knowingly enters into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another person in obtaining an unauthorized payment or benefit from the Medicaid program or a fiscal agent;

\*    \*    \*

(12) knowingly makes, uses, or causes the making or use of a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to this state under the Medicaid program.

211.  BMS violated V.T.C.A. Hum. Res. Code § 36.002 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Texas from at least 1994 to the present by its violation of federal and state laws,

- 69 -

including, the Anti-Kickback Act, the Stark Act and Best-Pricing Requirements, as described herein.

212.   The State of Texas, by and through the Texas Medicaid program and other state healthcare programs, and unaware of BMS' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

213.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Texas in connection with BMS' fraudulent and illegal practices.

214.   Had the State of Texas known that BMS was violating the federal and state laws cited herein, it wound not have paid the claims submitted by health care providers and third party payers in connection with BMS' fraudulent and illegal practices.

215.   As a result of BMS' violations of V.T.C.A. Hum. Res. Code § 36.002, the State of Texas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

216.   BMS did not, within 30 days after it first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

217.   Mr. Wilson is a private person with direct and independent knowledge of the

allegations of this Complaint, who has brought this action pursuant to V.T.C.A. Hum. Res. Code § 36.101 on behalf of himself and the State of Texas.

218.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Texas in the operation of its Medicaid program.

219.   WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against BMS:

To the STATE OF TEXAS:

Damages at two times the value of any payment or monetary or in-kind benefit provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts set forth above, as provided by the Texas Human Resources Code § 36.052(a)(1) & (4)

Civil penalties of $15,000 for each and every unlawful act set forth above that resulted in injury to a person younger than 18 years of age, as provided by the Texas Human Resources Code § 36.052(3)(A)

Pre- and post-judgment interest, Tex. Hum. Res. Code § 36.052(a)(2),

To RELATOR:

The maximum amount allowed pursuant to V.T.C.A. Hum Res. Code § 36.110(a), and/or any other applicable provision of law;

Reimbursement for reasonable expenses and costs which Relator incurred in connection with this action, Tex Hum Res. Code §§ 36.007 & 36.110(c);;;

Reasonable attorneys' fees which the Relator necessarily incurred in bringing and pressing this case, Tex Hum Res. Code §§ 36.007 & 36.110(c); and

Such further relief as this Court deems equitable and just.

## COUNT TWELVE
## VIOLATION OF THE MASSACHUSETTS FALSE CLAIMS ACT

220. Relator re-alleges and incorporates the allegations in paragraphs 1- 219 as if fully set forth herein. Additionally, Relator states that upon information and belief, the course of conduct described in this Complaint took place not only in Relator's region of California, but was a nationwide practice of BMS. BMS conducts business in the Commonwealth of Massachusetts. Upon information and belief, BMS' actions described herein occurred in Massachusetts as well.

221. This is a qui tam action brought by Relator and State of Massachusetts for treble damages and penalties under Massachusetts False Claims Act, Mass. Gen. Laws Ann. Chap 12 § 5(A) et seq.

222. Mass. Gen. Laws Ann. Chap 12 § 5B provides liability for any person who—

Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

Knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or any political subdivision thereof;

Conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;

Is a beneficiary of an inadvertent submission of a false claim to the common wealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the commonwealth or political subdivision within a reason able time after discovery of the false claim.

223.    In addition, Mass. Gen. Laws Ann. Chap. 118E § 41 prohibits the solicitation, receipt or offering of any remuneration, including any bribe ore rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any good, service or item for which payment may be made in whole or in part under the Massachusetts Medicaid program.

224.    BMS violated Mass. Gen. Laws Ann. Chap. 118E § 41 from at least 1994 to the present by engaging in the fraudulent and illegal practices described herein.

225.    BMS furthermore violated Mass. Gen. Laws Ann. Chap 12 § 5B and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Massachusetts from at least 1994 to the present by its violation of federal and state laws, including Mass. Gen. Laws Ann. Chap. 118E § 41, the Anti-Kickback Act, the Stark Act and Best-Pricing Requirements, as described herein.

226.    The State of Massachusetts, by and through the Massachusetts Medicaid program and other state health care programs, and unaware of BMS' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

227.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an

express condition of payment of claims submitted to the State of Massachusetts in connection with BMS' fraudulent and illegal practices.

228.   Had the State of Massachusetts known that BMS was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with BMS' fraudulent and illegal practices.

229.   As a result of BMS' violatons of Mass. Gen. Laws Ann. Chap. 12 § 5B the State of Massachusetts has been damaged in an amount far in excess of millions of dollars exclusive of interest.

230.   Mr. Wilson is a private person with direct and independent knowledge of the allegations of the Compliant, who has brought this action pursuant to Mass. Gen. Laws Ann Chap. 12 § 5(c(2)  on behalf of himself and the State of Massachusetts.

231.   This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon that exact same facts as the federal claim, and merely asserts separate damage to the State of Massachusetts in the operation of its Medicaid program.

232.   WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against BMS:

To the STATE OF MASSACHUSETTS:

    Three times the amount of actual damages which that State of Massachusetts has sustained as a result of BMS' fraudulent and illegal practices;

A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which BMS caused to be presented to the State of Massachusetts;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed pursuant to Mass. Gen. Laws Ann. Chap. 12 § 5F and/or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award of reasonable attorneys' fees and costs; and

Such further relief as this Court deems equitable and just.

## COUNT THIRTEEN

### VIOLATION OF THE TENNESSEE FALSE CLAIMS ACT

233.   Relator re-alleges and incorporates the allegations in paragraphs 1- 232 as if fully set forth herein.  Additionally, Relator states that upon information and belief, the course of conduct described in this Complaint took place not only in Relator's region of California, but was a nationwide practice of BMS.  BMS conducts business in the State of Tennessee.  Upon information and belief, BMS' actions described herein occurred in Tennessee as well.

234.   This is a qui tam action brought by Relator and the State of Tennessee to

recover treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 et seq.

235. § 71-5-182(a)(1) provides liability for any person who—

Presents, or causes to be presented to the state, a claim for payment under the Medicaid program knowing such claim is false or fraudulent;

Makes or uses, or causes to be made or used, a record or statement to get a false or fraudulent claim under the Medicaid program paid for a approved by the state knowing such record or statement is false;

Conspires to defraud the State by getting a claim allowed or paid under the Medicaid program knowing such claim is false or fraudulent.

236. BMS violated Tenn. Code Ann. § 71-5-182(a)(1) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Tennessee from at least 1994 to the present by its violation of federal and state laws, including the Anti-Kickback Act, that Stark Act and Best-Pricing Requirements, as described herein.

237. The State of Tennessee, by and through the Tennessee Medicaid program and other state health care programs, and unaware of BMS' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

238. Compliance with applicable Medicare, Medicaid and the various other federal

and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Tennessee in connection with BMS' fraudulent and illegal practices.

239.   Had the State of Tennessee known that BMS violated the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with BMS' fraudulent and illegal practices.

240.   As a result of BMS' violations of Tenn. Code Ann. § 71-5-182(a)(1), the State of Tennessee has been damaged in an amount far in excess of millions of dollars exclusive of interest.

241.   Mr. Wilson is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Tenn. Code Ann. § 71-5-183(a)(1) on behalf of himself and the State of Tennessee.

242.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Tennessee in the operation of its Medicaid program.

243.   WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against BMS:

To the STATE OF TENNESSEE:

Three times the amount of actual damages which the State of Tennessee has sustained as a result of BMS' fraudulent and illegal practices;

A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which BMS caused to be presented to the State of Tennessee;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed to Tenn. Code Ann. §71-5-183(c) and/or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award of reasonable attorneys' fees and costs; and

Such further relief as this Court deems equitable and just.

## COUNT FOURTEEN

## VIOLATION OF THE DELAWARE FALSE AND REPORTING CLAIMS ACT

244. Relator re-alleges and incorporates the allegations in paragraphs 1-243 as if fully set forth herein. Additionally, Relator states that upon information and belief, the course of conduct described in this Complaint took place not only in Relator's region of California, but was a nationwide practice of BMS. BMS conducts business in the State of Delaware. Upon information and belief, BMS' actions described herein occurred in Delaware as well.

245. This is a qui tam action brought by Relator and the State of Delaware to

recover treble damages and civil penalties under the Delaware Medicaid False Claims Act, 6 Del. C. § 1201 et seq.

246.   6 Del. C. § 1201 et seq. provides liability for any person who—

> Knowingly presents, or causes to be presented, directly or indirectly, to an officer or employee of the Government a false or fraudulent claim for payment or approval;

> Knowingly makes, uses or causes to be made or used, directly or indirectly, a false record or statement to get a false or fraudulent claim paid or approved;

> Conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

> Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, increase or decrease an obligation to pay or transmit money or property to or from the Government

247.   Further, 31 Del. C. § 1005 provides that—

> It shall be unlawful for any person to offer or pay any remuneration (including any kickback, bribe or rebate) directly or indirectly, in cash or in kind to induce any other person . . . [t]o purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any property, facility, service, or item of medical care or medical assistance for which payment may be made in whole or in part under any public assistance program.

248.   BMS violated 6 Del. C. § 1201 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Delaware from 1994 to the present by its violation of federal and state laws, including 31 Del. C. §1005, and

Anti-Kickback Act, the Stark Act and Best-Pricing Requirements, as described herein.

249.   The State of Delaware, by and through the Delaware Medicaid program and other state health care programs, and unaware of BMS' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

250.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Delaware in connection with BMS' fraudulent and illegal practices.

251.   Had the State of Delaware known that BMS was violating the federal and state laws cited herein, it wound not have paid the claims submitted by health care providers and third party payers in connection with BMS' fraudulent and illegal practices.

252.   As a result of BMS' violations of 6 Del C. § 1201(a), the  State of Delaware has been damage in an amount far in excess of millions of dollars exclusive of interest.

253.   BMS did not, within 30 days after it first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

254.   Mr. Wilson is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to 6 Del. C. § 1203(b) on behalf of himself and the State of Delaware.

255. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Delaware in the operation of its Medicaid program.

256. WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties against BMS:

To the STATE OF DELAWARE:

Three times the amount of actual damages which the State of Delaware has sustained as a result of BMS' fraudulent and illegal practices;

A civil penalty on not less then $5,500 and not more than $ 11,000 for each false claim which BMS caused to be presented to the State of Delaware;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed pursuant to 6 Del C. § 1205,and /or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award of reasonable attorneys' fees and costs; and

Such further relief as this Court deems equitable and just.

## COUNT FIFTEEN

## VIOLATION OF THE NEVADA FALSE CLAIMS ACT

257. Relator re-alleges and incorporates the allegations in paragraphs 1- 256 as if fully set forth herein. Additionally, Relator states that upon information and belief, the course of conduct described in this Complaint took place not only in Relator's region of California, but was a nationwide practice of BMS. BMS conducts business in the State of Nevada. Upon information and belief, BMS' actions described herein occurred in Nevada as well.

258. This is a qui tam action brought by Relator and the State of Nevada to recover treble damages and civil penalties under the Nevada False Claims Act, N.R.S. § 357.010 et. seq.

259. N.R.S. § 357.040(1) provides liability for any person who—

Knowingly presents or causes to be presented a false claim for payment or approval;

Knowingly makes or uses, or causes to be made or used, a false record or statement to obtain payment or approval of a false claim;

Conspires to defraud by obtaining allowance or payment of a false claim;

Is a beneficiary of an inadvertent submission of a false claim and, after discovering the falsity of the claim, fails to disclose the falsity to the state or political subdivision within a reasonable time.

260. In addition, N.R.S. § 422.560 prohibits the solicitation, acceptance or receipt of anything of value in connection with the provision of medical goods or services for which payment may be made in whole or in part under the Nevada Medicaid program.

261. BMS violated N.R.S. § 422.560 from at least 1994 to the present by engaging in the fraudulent and illegal practices described herein.

262. BMS furthermore violated N.R.S. § 357.040(1) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Nevada from at least 1994 to the present by its violation of federal and state laws, including N.R.S. § 422.560, the Anti-Kickback Act, and Stark Act and Best-Pricing Requirements, as described herein.

263. The State of Nevada, by and through the Nevada Medicaid program and other health care programs, and unaware of BMS' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

264. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of clams submitted to the State of Nevada in connection with BMS' fraudulent and illegal practices.

265. Had the State of Nevada known that BMS was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with BMS' fraudulent and illegal practices.

266. As a result of BMS' violations of N.R.S. § 357.040(1) the State of Nevada has been damaged in an amount far in excess or millions of dollars exclusive of interest.

267. Mr. Wilson is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N.R.S. § 357.080(1) on behalf of himself and the State of Nevada.

268. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicted upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Nevada in the operation of its Medicaid program.

269. WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against BMS:

To the STATE OF NEVADA:

Three times the amount of actual damages which the State of Nevada has sustained as a result of BMS' fraudulent and illegal practices;

A civil penalty of not less than $2,000 and not more than $10,000 for each false claim which BMS caused to be presented to the State of Nevada;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed pursuant to N.R.S § 357.210 and/or any other

applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award of reasonable attorneys' fees and costs; and

Such further relief as this Court deems equitable and just.

## COUNT SIXTEEN

### VIOLATION OF THE LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW

270.   Relator re-alleges and incorporates the allegations in paragraphs 1- 269 as if fully set forth herein.  Additionally, Relator states that upon information and belief, the course of conduct described in this Complaint took place not only in Relator's region of California, but was a nationwide practice of BMS.  BMS conducts business in the State of Louisiana.  Upon information and belief, BMS' actions described herein occurred in Louisiana as well.

271.   This is a qui tam action brought by Relator and the State of Louisiana to recover treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La Rev. Stat. Ann § 437.1 et seq.

272.   La. Rev. Stat. Ann. § 438.3 provides –

No person shall knowingly present or cause to be presented a false or fraudulent claim;

No person shall knowingly engage in misrepresentation to obtain, or attempt to obtain, payment from medial assistance programs funds;

No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim;

273.   In addition, La. Rev. Stat. Ann.§ 438.2(A) prohibits the solicitation, receipt, offering or payment of any financial inducements, including kickbacks, bribes, rebated, etc., directly or indirectly, overtly or covertly, in cash or in kind, for furnishing health care goods or services paid for in whole or in part by the Louisiana medical assistance programs.

274.   BMS violated La. Rev. Stat. Ann § 438.2(A) from at least 1994 to the present by engaging in the fraudulent and illegal practices described herein.

275.   BMS furthermore violated La. Rev. Stat. Ann. § 438.3 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Louisiana from at least 1994 to the present by its violation of federal and state laws, including La. Rev. Stat. Ann. § 438.2(A), the Anti-Kickback Act, and Stark Act and Best-Pricing Requirements, as described herein.

276.   The State of Louisiana, by and through the Louisiana Medicaid program and other state health care programs, and unaware of BMS' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

277.   Compliance with applicable Medicare, Medicaid and the various other federal

and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Louisiana in connection with BMS' fraudulent and illegal practices.

278.   Had the State of Louisiana known that BMS was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with BMS's fraudulent and illegal practices.

279.   As a result of BMS' violations of La. Rev. Stat. Ann. § 438.3 the State of Louisiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

280.   Mr. Wilson is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to La. Rev. Stat. Ann. § 439.1(A) on behalf of himself and the State of Louisiana.

281.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Louisiana in the operation of its Medicaid program.

282.   WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against BMS:

To the STATE OF LOUISIANA:

> Three times the amount of actual damages which the State of Louisiana has sustained as a result of BMS' fraudulent and illegal practices;

A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which BMS caused to be presented to the State of Louisiana;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed pursuant to La. Rev. Stat. § 439.4(A) and/or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award or reasonable attorneys' fees and costs; and

Such further relief as this Court deems equitable and just.

## COUNT SEVENTEEN
## VIOLATION OF THE HAWAII FALSE CLAIMS ACT

283.   Relator re-alleges and incorporates the allegations in paragraphs 1- 282 as if fully set forth herein.  Additionally, Relator states that upon information and belief, the course of conduct described in this Complaint took place not only in Relator's region of California, but was a nationwide practice of BMS.  BMS conducts business in the State of Hawaii.  Upon information and belief, BMS' actions described herein occurred in Hawaii as well.

284. This is a qui tam action brought by Relator and the State of Hawaii to recover treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661.21 et seq.

285. Haw. Rev. Stat. § 661-21(a) provides liability for any person who—

Knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;

Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

Conspires to defraud the state by getting a false or fraudulent claim allowed or paid; or

Is a beneficiary of an inadvertent submission of a false claim to the State, who subsequently discovers the falsity of the claim, and fails to disclose the false claim to the State within a reasonable time after discovery of the false claim.

286. BMS violated Haw. Rev. Stat. § 661.21(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Hawaii from at least 1994 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and Stark Act and Best-Pricing Requirements, as described herein.

287. The State of Hawaii, by and through the Hawaii Medicaid program and other state health care programs, and unaware of BMS' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection

therewith.

288.   Compliance with applicable Medicare, Medicaid and the various other federal state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Hawaii in connection with BMS' fraudulent and illegal practices.

289.   Had the State of Hawaii known that BMS was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with BMS' fraudulent and illegal practices.

290.   As a result of BMS' violations of Haw. Rev. Stat. § 661-21(a) the State of Hawaii has been damaged in an amount far in excess of millions of dollars exclusive of interest.

291.   Mr. Wilson is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Haw. Rev. Stat. § 661-25(a) on behalf of himself and the State of Hawaii.

292.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Hawaii in the operation of its Medicaid program.

293.   WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against BMS:

To the STATE OF HAWAII:

   Three times the amount of actual damages which the State of Hawaii has sustained as a result of BMS' fraudulent and illegal practices;

A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which BMS caused to be presented to the State of Hawaii;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed pursuant to Haw. Rev. Stat. § 661-27 and /or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award of reasonable attorneys' fees and costs; and

Such further relief as this Court deems equitable and just.

## COUNT EIGHTEEN
## VIOLATION OF THE DISTRICT OF COLUMBIA PROCUREMENT REFORM AMENDMENT ACT

294.    Relator re-alleges and incorporates the allegations in paragraphs 1- 293 as if fully set forth herein.  Additionally, Relator states that upon information and belief, the course of conduct described in this Complaint took place not only in Relator's region of California, but was a nationwide practice of BMS.  BMS conducts business in the

District of Columbia.  Upon information and belief, BMS' actions described herein occurred in the District of Columbia as well.

295.  This is a qui tam action brought by Relator and the District of Columbia to recover treble damages and civil penalties under the District of Columbia Procurement Reform Amendment Act, D.C. § 2-308.13 et seq.

296.  D.C. Code § 2-30814(a) provides liability for any person who-

> Knowingly presents, or causes to be presented, to an officer or employee of the District a false claim for payment or approval;

> Knowingly makes, uses or causes to be made or used, a false record or statement to get a false claim paid or approved by the District;

> Conspires to defraud the District by getting a false claim allowed or paid by the District;

> Is the beneficiary of an inadvertent submission of a false claim to the District, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the District.

297.  In addition, D.C. Code § 4-802(c) prohibits soliciting, accepting, or agreeing to accept any type of remuneration for the following:

> Referring a recipient to a particular provider of any item or service or for which payment may be made under the District of Columbia Medicaid program; or

Recommending the purchase, lease, or order of any good, facility, service, or item for which payment may be made under the District of Columbia Medicaid Program.

298. BMS violated D. C. Code § 4-802(c) from at least 1994 to the present by engaging in the fraudulent and illegal practices described herein.

299. BMS furthermore violated D. C. Code § 2-308.14(a) and knowingly caused thousands of false claims to be made, used and presented to the District of Columbia from at least 1994 to the present by its violation of federal and state laws, including D. C. Code § 4-802(c), the Anti-Kickback Act, and Stark Act and Best-Pricing Requirements, as described herein.

300. The District of Columbia, by and through the District of Columbia Medicaid program and other state health care programs, and unaware of BMS' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

301. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the District of Columbia is connection with BMS' fraudulent and illegal practices.

302. Had the District of Columbia known that BMS was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with BMS' fraudulent and illegal practices.

303. As a result of BMS' violations of D.C. Code § 2-308.14(a) the District of Columbia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

304. Mr. Wilson is private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to D.C. Code § 2-308.15(b) on behalf of himself and the District of Columbia.

305. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the District of Columbia in the operation of its Medicaid program.

306. WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against BMS:

To the DISTRICT OF COLUMBIA:

> Three times the amount of actual damages which the District of Columbia has sustained as a result of BMS' fraudulent and illegal practices;

> A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which BMS caused to be presented to the District of Columbia;

> Prejudgment interest; and

> All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed pursuant to D. C. Code § 2-308.15(f) and /or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award of reasonable attorneys' fees and costs; and

Such further relief as this court deems equitable and just.

## COUNT NINETEEN

**VIOLATION OF THE ARKANSAS MEDICAID FRAUD FALSE CLAIMS ACT**

307.   Relator re-alleges and incorporates the allegations in paragraphs 1- 306 as if fully set forth herein.  Additionally, Relator states that upon information and belief, the course of conduct described in this Complaint took place not only in Relator's region of California, but was a nationwide practice of BMS.  BMS conducts business in the State of Arkansas.  Upon information and belief, BMS' actions described herein occurred in the State of Arkansas as well.

308.   This is a qui tam action brought by Relator and the Arkansas to recover treble damages and civil penalties under the Arkansas Medicaid Fraud False Claims Act, A.C.A. § 20-77-901 et seq.

309.   The Arkansas Medicaid Fraud False Claims Act § 20-77-902 provides liability for any person who-

Knowingly makes or causes to be made any false statement or representation of a material fact in any application for any benefit or

payment under the Arkansas Medicaid program;

At any time knowingly makes or causes to be made any false statement or representation of a material fact for use in determining rights to a benefit or payment;

310. In addition, A.C.A. § 20-77-902(7)(A) prohibits soliciting, accepting, or agreeing to accept any type of remuneration for the following:

Recommending the purchase, lease, or order of any good, facility, service, or item for which payment may be made under the Arkansas Medicaid program.

311. BMS violated the Arkansas Medicaid Fraud False Claims Act § 20-77-902(1) (2) & (7)(A) from at least 1994 to the present by engaging in the fraudulent and illegal practices described herein.

312. BMS furthermore violated Arkansas Medicaid Fraud False Claims Act § 20-77-902(1) & (2) and knowingly caused thousands of false claims to be made, used and presented to Arkansas from at least 1994 to the present by its violation of federal and state laws, including A.C.A. § 20-77-902(7)(A), the Anti-Kickback Act, and Stark Act and Best-Pricing Requirements, as described herein.

313. Arkansas, by and through the Arkansas Medicaid program and other state health care programs, and unaware of BMS' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

314. Compliance with applicable Medicare, Medicaid and the various other federal

and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to Arkansas is connection with BMS' fraudulent and illegal practices.

315. Had the Arkansas known that BMS was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with BMS' fraudulent and illegal practices.

316. As a result of BMS' violations of § 20-77-902(1) (2) & (7)(A), the State of Arkansas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

317. Mr. Wilson is private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to A.C.A. § 20-77-911(a) on behalf of himself and the State of Arkansas.

318. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Arkansas in the operation of its Medicaid program.

319. WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against BMS:

To the STATE OF ARKANSAS:

Three times the amount of actual damages which the State of Arkansas has sustained as a result of BMS' fraudulent and illegal practices;

A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which BMS caused to be presented to the State of Arkansas;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed pursuant to A.C.A. § 20-77-911(a) and /or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award of reasonable attorneys' fees and costs; and

Such further relief as this court deems equitable and just.

## COUNT TWENTY

### VIOLATION OF THE FLORIDA FALSE CLAIMS ACT

320. Relator re-alleges and incorporates the allegations in paragraphs 1- 319 as if fully set forth herein. Additionally, Relator states that upon information and belief, the course of conduct described in this Complaint took place not only in Relator's region of California, but was a nationwide practice of BMS. BMS conducts business in the State of Florida. Upon information and belief, BMS' actions described herein occurred in the State of Florida as well.

321. This is a qui tam action brought by Relator and the State of Florida to recover

treble damages and civil penalties under the Florida False Claims Act, West's F.S.A. §

68.081 et seq.

322.   West's F.S.A. § 68.082 provides liability for any person who-

Knowingly presents or causes to be presented to an officer or employee of
an agency a false claim for payment or approval

Knowingly makes, uses, or causes to be made or used a false record or
statement to get a false or fraudulent claim paid or approved by an agency

Conspires to submit a false claim to an agency or to deceive an agency for
the purpose of getting a false or fraudulent claim allowed or paid

323.   BMS violated West's F.S.A. § 68.082 from at least 1994 to the present by

engaging in the fraudulent and illegal practices described herein.

324.   BMS furthermore violated West's F.S.A. § 68.082 and knowingly caused

thousands of false claims to be made, used and presented to the State of Florida from at

least 1994 to the present by its violation of federal and state laws, including the Anti-

Kickback Act, and Stark Act and Best-Pricing Requirements, as described herein.

325.   The State of Florida, by and through the State of Florida Medicaid program

and other state health care programs, and unaware of BMS' fraudulent and illegal

practices, paid the claims submitted by health care providers and third payers in

connection therewith.

326.   Compliance with applicable Medicare, Medicaid and the various other federal

and state laws cited herein was an implied, and upon information and belief, also an

express condition of payment of claims submitted to the State of Florida in connection with BMS' fraudulent and illegal practices.

327. Had the State of Florida known that BMS was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with BMS' fraudulent and illegal practices.

328. As a result of BMS' violations of West's F.S.A. § 68.082 the State of Florida has been damaged in an amount far in excess of millions of dollars exclusive of interest.

329. Mr. Wilson is private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to West's F.S.A. § 68.083(2) on behalf of himself and the State of Florida.

330. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Florida in the operation of its Medicaid program.

331. WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against BMS:

To the STATE OF FLORIDA:

Three times the amount of actual damages which the State of Florida has sustained as a result of BMS' fraudulent and illegal practices;

A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which BMS caused to be presented to the State of Florida;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed pursuant to West's F.S.A. § 68.085 and /or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award of reasonable attorneys' fees and costs; and

Such further relief as this court deems equitable and just.

**COUNT TWENTY-ONE**

**VIOLATION OF THE NEW MEXICO MEDICAID FALSE CLAIMS ACT**

332. Relator re-alleges and incorporates the allegations in paragraphs 1- 331 as if fully set forth herein. Additionally, Relator states that upon information and belief, the course of conduct described in this Complaint took place not only in Relator's region of California, but was a nationwide practice of BMS. BMS conducts business in the State of New Mexico. Upon information and belief, BMS' actions described herein occurred in the State of New Mexico as well.

333. This is a qui tam action brought by Relator and the State of New Mexico to recover treble damages and civil penalties under the New Mexico Medicaid False Claims Act, N. M. S. A. 1978, § 27-14-1 et seq.

334. N. M. S. A. 1978, § 27-14-4 provides liability for any person who-

> Presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing that the person receiving a Medicaid benefit or payment is not authorized or is not eligible for a benefit under the Medicaid program

> Makes, uses or causes to be made or used a record or statement to obtain a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false

> Conspires to defraud the state by getting a claim allowed or paid under the Medicaid program knowing that such claim is false or fraudulent

335. BMS violated N. M. S. A. 1978, § 27-14-4 from at least 1994 to the present by engaging in the fraudulent and illegal practices described herein.

336. BMS furthermore violated N. M. S. A. 1978, § 27-14-4 and knowingly caused thousands of false claims to be made, used and presented to the State of New Mexico from at least 1994 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and Stark Act and Best-Pricing Requirements, as described herein.

337. The State of New Mexico, by and through the State of New Mexico Medicaid program and other state health care programs, and unaware of BMS' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

338. Compliance with applicable Medicare, Medicaid and the various other federal

and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New Mexico in connection with BMS' fraudulent and illegal practices.

339.  Had the State of New Mexico known that BMS was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with BMS' fraudulent and illegal practices.

340.  As a result of BMS' violations of N. M. S. A. 1978, § 27-14-4 the State of New Mexico has been damaged in an amount far in excess of millions of dollars exclusive of interest.

341.  Mr. Wilson is private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N. M. S. A. 1978, § 27-14-7 on behalf of himself and the State of New Mexico.

342.  This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Mexico in the operation of its Medicaid program.

343.  WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against BMS:

To the STATE OF NEW MEXICO:

Three times the amount of actual damages which the State of New Mexico has sustained as a result of BMS' fraudulent and illegal practices;

A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which BMS caused to be presented to the State of New Mexico;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed pursuant to N. M. S. A. 1978, § 27-14-9 and /or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award of reasonable attorneys' fees and costs; and

Such further relief as this court deems equitable and just.

## COUNT TWENTY-TWO

## VIOLATION OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT

344.   Relator re-alleges and incorporates the allegations in paragraphs 1- 343 as if fully set forth herein.  Additionally, Relator states that upon information and belief, the course of conduct described in this Complaint took place not only in Relator's region of California, but was a nationwide practice of BMS.  BMS conducts business in the Commonwealth of Virginia.  Upon information and belief, BMS' actions described

herein occurred in the Commonwealth of Virginia as well.

345. This is a qui tam action brought by Relator and the Commonwealth of Virginia to recover treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 et seq.

346. Va. Code Ann. § 8.01-216.3 provides liability for any person who-

> Knowingly presents, or causes to be presented, to an officer or employee of the Commonwealth a false or fraudulent claim for payment or approval;

> Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Commonwealth

> Conspires to defraud the Commonwealth by getting a false or fraudulent claim allowed or paid

347. BMS violated Va. Code Ann. § 8.01-216.3 from at least 1994 to the present by engaging in the fraudulent and illegal practices described herein.

348. BMS furthermore violated Va. Code Ann. § 8.01-216.3 and knowingly caused thousands of false claims to be made, used and presented to the Commonwealth of Virginia from at least 1994 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and Stark Act and Best-Pricing Requirements, as described herein.

349. The Commonwealth of Virginia, by and through the Commonwealth of Virginia Medicaid program and other state health care programs, and unaware of BMS'

fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

350.  Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the Commonwealth of Virginia is connection with BMS' fraudulent and illegal practices.

351.  Had the Commonwealth of Virginia known that BMS was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with BMS' fraudulent and illegal practices.

352.  As a result of BMS' violations of Va. Code Ann. § 8.01-216.3 the Commonwealth of Virginia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

353.  Mr. Wilson is private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Va. Code Ann. § 8.01-216.5(A) on behalf of himself and the Commonwealth of Virginia

354.  This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Commonwealth of Virginia in the operation of its Medicaid program.

355.  WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against BMS:

To the COMMONWEALTH OF VIRGINIA:

    Three times the amount of actual damages which the Commonwealth of Virginia has sustained as a result of BMS' fraudulent and illegal practices;

    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which BMS caused to be presented to the Commonwealth of Virginia;

    Prejudgment interest; and

    All costs incurred in bringing this action.

To RELATOR:

    The maximum amount allowed pursuant to Va. Code Ann. § 8.01-216.7 and /or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award of reasonable attorneys' fees and costs; and

Such further relief as this court deems equitable and just.

### **DEMAND FOR JURY TRIAL**

Relator hereby demands a jury trial.

Dated: September 22, 2006

**UNITED STATES OF AMERICA, ex rel.**

**Relator**

By:_____

**WATERS & KRAUS LLP**
C. Andrew Waters, CA Bar No. 147259
Michael L. Armitage, CA Bar No. 152740
Paul Cook, CA Bar No. 170901
Michael B. Gurien, CA Bar No. 180538
222 N. Sepulveda Blvd.
Suite 1900
El Segundo, California 90245
Tel. 310-414-8146
Fax. 310-414-8156

Charles S. Siegel, TX Bar No. 18341875
Loren Jacobson, TX Bar No. 24050813
3219 McKinney Ave.
Dallas, Texas 75204
Tel. 214-357-6244
Fax. 214-871-2263

*ATTORNEYS FOR RELATOR*